## JOHN BARE v. PENNSYLVANIA R. CO.

APPEAL BY DEFENDANT FROM THE COURT OF COMMON PLEAS
OF HUNTINGDON COUNTY.

Argued April 24, 1890—Decided May 19, 1890.

The testimony for the plaintiff, in an action against a railroad company for negligence, showing that when the plaintiff approached a railroad crossing upon a public highway, it was blocked by freight trains standing; that he stopped while the trains were being cut to afford him passage, looked and listened, and saw and heard no approaching train; that when the trains were cut he approached near the crossing and again stopped, looked and listened, and then, seeing and hearing no approaching train, started to cross the tracks, when he was struck by an unscheduled freight train passing very rapidly without sounding the whistle or bell: in such case it was not error to refuse to instruct the jury to find for the defendant on the ground of the plaintiff's contributory negligence.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS and MITCHELL, JJ.

No. 79 January Term 1890, Sup. Ct.; court below, No. 8 February Term 1888, C. P.

On December 30, 1887, John Bare brought trespass against the Pennsylvania Railroad Company to recover damages for personal injuries received. Issue.

At the trial on May 23, 1889, it was shown that Jefferson street, in Mt. Union, approaches the railroad of defendant company at right angles from the south at a rapidly descending grade, and when it reaches the crossing there is a bank on either side, especially toward the east, obstructing the view at that point looking east. At this crossing there were three tracks on Pennsylvania Avenue. On the morning of July 6, 1887, both the south and the middle tracks were being used by

the defendant company in shifting its cars, and both tracks were blocked. The plaintiff approached the crossing on Pennsylvania Avenue, moving towards Jefferson street; and, being told by the ticket agent's son to wait a short time and the trains would be cut, he stopped at a point 27 feet distant from the south track. From this point there was an unobstructed view of the track eastward of about 1,700 feet. Then, waiting a few moments for trains to be cut, the plaintiff looked and listened and saw and heard no train approaching. The passage way across being about to be opened, the plaintiff drove upon Jefferson street to cross, and reached a point a few feet from the south track, where he had a view of the railroad eastward about 400 feet; he again stopped and looked and listened to see if there was an approaching train, and seeing and hearing none, and believing that the trains had been cut for the purpose of allowing him to cross, he drove on. When his horse had passed the cars on the middle track and had got upon the north track, he was struck by an unscheduled west-bound freight train running very rapidly, without, as was claimed, either whistling or ringing the bell. The horse was killed, the buggy broken to pieces, and the plaintiff severely injured.

At the close of the testimony on both sides, the court, FURST, P. J., instructed the jury, and answered one of the defendant's points as follows:

The defendant has submitted to the court a point which reads as follows:

That the defendant, at the conclusion of plaintiff's testimony, having moved for a compulsory nonsuit, the court now instructs you that the plaintiff is guilty of contributory negligence which precludes recovery, having testified as follows:

I went on towards Jefferson street and stopped in front of the marble yard before I got quite to the crossing. Q. That is where the horse and buggy stops in the photograph? A. Yes, I remained there for a very short time; then I saw indications of the crossing being opened, and I drove down to the crossing on Jefferson street, and remained there a very short time until the crossing was clear, and then drove on. Q. What then? A. That is the last I did. Q. What did you do before you drove down on that crossing? A. Before I drove down on the

### Charge of Court below.

crossing, I had a good view from where I was, opposite the marble yard on ˉPennsylvania Avenue; I could see down; I looked down to see whether there was any train approaching, to see if there was any danger; I could look down east, down to the East Broad Top coal chutes and graveyard, some 1800 feet below. Q. Did you listen? A. I listened to hear if the train was approaching. Q. Did you hear or see any thing? A. I did not. Q. You looked down that way for what? A. To see if there was any train approaching. Q. What did you listen for? . . . . Q. How long did you stop on top of the bank there? A. Opposite the marble yard on Pennsylvania Avenue? Q. Yes. A. I may have been there a minute or two; I cannot tell just the length of time. Q. Did you leave the top of the bank there and why did you leave it? A. I left that thinking the crossing would be open as soon as I got down there. Q. When did you find the crossing open? A. Very soon after I got there; it couldn't have been over a minute or a half a minute after I got there. Q. What made you start your horse down? A. I wanted to be in readiness there, so when the crossing was opened I could go right through. Q. Did you see any indications that the crossing would be opened before you started down? Objected to. A. I noticed the movement of the cars; I supposed they were about opening the crossing, and when I got down it was near about open. Q. What did you do then? A. I drove right up; just as soon as it was opened sufficiently to let me through, I drove right on; the crossing was fully opened at the time I started to go over it.

Cross-examination: Q. When you were in front of the marble yard you looked down towards the bridge; that was the only time you looked eastward? A. I was looking eastward just before crossing; then the crossing was opened, when I drove across I looked eastward too; I had my face eastward when I drove down to it, driving down Pennsylvania Avenue. Q. You did not turn your head at any time to look eastward? A. I was looking eastward, of course; I was taking all the precautions I could to see if there was any train approaching. Q. I asked you if you turned your head eastward to look at any time, or if you only looked when you were going in that direction? A. I had my head eastward; driving down, my head would be eastward. Q. That was the only time you looked eastward,

when you had your head in that direction? A. I looked eastward when I was up before I came down. Q. Can't you answer my question, yes or no; I asked you if you looked eastward except when you had your face turned in that direction? A. Certainly, I looked eastward to see if there was any danger approaching. Q. When? A. At the time of crossing? Q. Yes, at the time of crossing? A. Well, about a little before. Q. How long before? A. Well, it was a very short time before. Q. A minute and a half as you said this morning? A. Oh, no, sir, a half a minute. Q. When you were in front of the marble yard your horse's head was turned eastward? A. Yes, sir. Q. You drove down then on to Jefferson street and just before crossing you stopped there on Jefferson street? A. Made a mere stop; the crossing then was so nearly open, that I had just merely to stop there. Q. Did you look eastward when you stopped the second time on Jefferson street? A. I did, yes, sir. Q. How did you look; did you turn your head to look out of the side of your buggy? A. My horse was standing with his head east; he was coming east; my horse coming off of Pennsylvania avenue on to Jefferson street, of course, his head would be eastward, probably a little bearing on to the north.

By the court: You were driving eastward on Pennsylvania Avenue? A. Yes, sir.

Q. You kept on in that direction until you came to Jefferson street? A. Yes, sir. Q. There didn't you turn to your left to go across the track? A. Yes, I turned down the middle, you see the street is narrow; Pennsylvania Avenue is only 27 feet, I guess; I didn't take much of a turn to go across; probably it wouldn't be more then 20 feet from the line of the pavement.

Mr. Dorris: When you left Pennsylvania Avenue and got on to Jefferson street, you turned north then? A. The horse's head was not north, though it was somewhat north, it was north of east; before crossing, I didn't turn my horse square down until the crossing was fully opened, until there was no danger; then, of course, I went right across. Q. Then you stopped on Jefferson street a little while before you turned north? A. No, I drove down on Jefferson street and about by the time I got down the crossing was about open; just before I started I saw they were opening the crossing, and by the time I could get to the crossing it would be opened, and when I got to Jef

### Charge of Court below.

ferson street I merely stopped until it was sufficiently opened, and then I went right through. Q. When did you look, just before you turned down on Jefferson street, just before your horse's head was turned north, or after? A. I looked while in both positions; of course, I was anxious to know if there was anything else in the way or coming. Q. Did you turn your head east after you turned your horse's head north, to see if there was a train coming from the east? A. I think I did. Q. Not what you thought, but did you? A. I know I was looking for trains, or whether there was any encumbrance on the track. Q. Did you turn and look eastward, after you turned your horse's head towards the north to cross the track? A. I think I did; I certainly did, because I was anxious to know if there was any approaching trains; I took all the precautions I could. Q. You think you did? A. I know I did. Q. You are positive about that? A. Yes, I took all the precautions a man could take. Q. Did you turn your head to look? A. I wouldn't have to turn my head clear around to see there. Q. Where were you when you made the turn to come north? A. Why, it was down very close to the track, to the southern track, the third track; it was very close to that. Q. How close? A. I don't suppose it was over 8 feet, probably 8 or 10 feet. Q. How long did you stop there? A. I merely stopped the least bit; by the time I got there the crossing was about clear; I halted a little until I saw that it was open, then I drove right over, but when I tried to drive over I didn't get over. Q. Just as you made the turn to cross, did you look east? A. Well, I think I did. Q. What did you see? A. I don't know that I saw anything. Q. Did you stop at the south track of the East Broad Top track? A. Well, that was the East Broad Top and Pennsylvania are the same thing; there are three rails on that track. Q. Did you stop at the one nearest to you? A. Yes, I stopped at the one nearest to me. Q. Then you made three stops? A. No, sir, I did not. Q. You made a stop in front of the marble yard? A. Yes, sir. Q. You stopped down at the foot of the bank, south of the railroad on Jefferson street, just before you turned? A. Yes, sir. Q. And now you say you stopped near the south rail of the East Broad Top track? A. No, sir, that was when I drove down the bank; by the time I got to there, it was so I could go right through.

Q. Then you didn't stop at the south rail of the third track? A. No, sir.  Q. How far away were you when you stopped the last time from the south rail of the third track?  A. I was very near, probably 8 or 10 feet.  Q. But you didn't stop when you got there?  A. From the point I had stopped I drove on until I got struck.

Answer: Our answer to this point is reserved for further consideration.  The verdict of the jury, if in favor of the plaintiff, will be taken subject to the opinion of the court upon the point reserved.

The jury returned a verdict for the plaintiff for $5,141.50. Thereupon the defendant filed a motion for judgment in favor of the defendant on the point reserved, " or, if that be denied, for a new trial."

On October 18, 1889, after the defendant's motion had been argued, the court, FURST, P. J., filed an opinion in part as follows:

We are not prepared to say, after a full consideration of the case, since its trial, that we should not have submitted it to the jury.  The only question involved in the reserved point is, " that the contributory negligence of the plaintiff precluded a recovery."  Does plaintiff's evidence show such negligence on his part as required us to withdraw the case from the jury? If it does, we were in error in submitting the case; if it does not, we could not do otherwise than submit it.

Negligence is ordinarily a question of fact for the jury.  But where the undisputed facts showed negligence on plaintiff's part, it is just as clear, the question is for the court to decide, and not the jury.

That plaintiff was injured at the crossing, at Mt. Union, is not disputed.  Did he use due care in attempting to cross? He testifies that the crossing was blocked by a freight train when he arrived; that the employees of the company engaged upon this train, at the request of young Fuller, son of the ticket agent, undertook to cut the freight train so that he could pass over; that freight cars stood on the east and west sides of the crossing; that when he came as near to the crossing as practicable on Pennsylvania Avenue, he stopped his horse and

Arguments.

looked and listened; that he there had a full view of the road, and could see a long distance in the direction the train came; that he saw nothing and heard nothing; that he waited in this position until he saw the train was about cut, and not knowing of any danger, he turned his horse down on Jefferson street and there halted, perhaps half a minute; that the train being then cut he attempted to cross over, and in so doing, a passenger train passing on the opposite track struck him, resulting in injuries of a very serious nature; that the passenger locomotive gave no signal of its approach to the crossing. The defendant's testimony, if believed, would show negligence on the plaintiff's part, but this raises contradiction of testimony, which must go to the jury.

We endeavored to call the attention of the jury to the duty imposed upon plaintiff under the law, as we understand the rule to be, in relation to crossings. We also called their attention to the question whether plaintiff, before crossing or attempting to cross, stopped at the nearest point to the track, where he could see and hear, and whether he properly discharged the duty devolving upon him before making the effort to cross. We said to the jury he must stop and look and listen, immediately before crossing upon the track. . It seems to us, that the facts on the part of plaintiff's side of the case were such that, if no testimony had been offered by defendant, we would have been bound to submit the case. . . . .

—The defendant's motion was then overruled, and judgment entered upon the verdict. Thereupon the defendant took this appeal, assigning for error the refusal to instruct the jury as requested by the plaintiff's point.

*Mr. J. D. Dorris* (with him *Mr. W. Dorris*), for the appellant.

Counsel cited: Central R. Co. v. Feller, 84 Pa. 229; Penna. R. Co. v. Beale, 73 Pa. 509; Greenwood v. Railroad Co., 124 Pa. 572; Marland v. Railroad Co., 123 Pa. 487; Carroll v. Railroad Co., 12 W. N. 348; Moore v. Railroad Co., 108 Pa. 349; Penna. R. Co. v. Bell, 122 Pa. 58; Penna. R. Co. v. Mooney, 126 Pa. 252.

*Mr. W. M Williamson* (with him *Mr. B. J. Devore, Mr. W. H. Woods* and *Mr. J. S. Woods*), for the appellee.

Syllabus.

Counsel cited: Abraham v. Mitchell, 112 Pa. 230; McNeal v. Railway Co., 131 Pa. 184; Penna. R. Co. v. Ackerman, 74 Pa. 265; Phila. etc. R. Co. v. Hagan, 47 Pa. 244; Penna. R. Co. v. Ogier, 35 Pa. 60; Lehigh V. R. Co. v. Brandtmaier, 113 Pa. 610; Penna. R. Co. v. Weiss, 87 Pa. 447; Weiss v. Penna. R. Co., 79 Pa. 387; Penna. R. Co. v. Weber, 76 Pa. 157; Delaware R. Co. v. Jones, 128 Pa. 308.

PER CURIAM:

The only matter of which the defendant complains is that the court below refused to instruct the jury that the plaintiff was guilty of contributory negligence. The opinion of the learned judge in disposing of the reserved question is a sufficient answer to this proposition. We find no error in the record.

Judgment affirmed.

