Indianapolis Union Railway Company *v.* Neubacher *et al.*

---

### INDIANAPOLIS UNION RAILWAY COMPANY *v.* NEUBACHER ET AL.

[No. 1,651. Filed April 14, 1896. Rehearing denied Sept. 24, 1896.]

VERDICT.—*Presumption.*—Every presumption is in favor of the general verdict. *p. 29.*

SAME.—*Interrogatories.*—Where the evidence is not in the record, the answers to interrogatories will not be allowed to overthrow a general verdict, unless there is such antagonism upon the face of the record as is beyond any possibility of being removed by any evidence legitimately admissible under the issues. *p. 29.*

PRACTICE.—*Theory.*—Every case must proceed upon some theory; if a complaint is based upon one theory it can not be sustained upon some other. *p. 30.*

RAILROADS.— *Complaint.— Immaterial Allegations Need Not be Proved.*—An allegation in a complaint for personal injuries against a union railroad company under whose directions the trains of several different companies are operated, that the train which struck and injured plaintiff was a train of a designated company, is immaterial and need not be proved. *p. 30.*

SAME.—*Crossing.—Negligence.—Presumption.*—A person who is injured at a railroad crossing is presumed to be negligent; but this

Indianapolis Union Railway Company *v.* Neubacher *et al.*

presumption is overcome by a general verdict returned by the jury and approved by the trial court. *p. 33.*

SAME.—*Crossing.—Contributory Negligence.*—One is not, as a matter of law, guilty of contributory negligence in failing to wait until a train going in one direction has passed far enough to enable him to see whether a train on an adjoining track is approaching from the opposite direction, where a large number of trains pass the crossing daily and the safety gates are open, indicating that no train is approaching. *pp. 33-41.*

SAME.—*Crossing.—Violation of City Ordinance.—Negligence.*— Failure to operate safety gates at a railway crossing, as required by a city ordinance, is negligence. *p. 37.*

APPEAL.—*Contributory Negligence.—Verdict.*—The burden of showing on appeal that a general verdict for plaintiff is wrong because plaintiff was guilty of contributory negligence, rests upon defendant. *pp. 46-54.*

From the Marion Circuit Court. *Affirmed.*

*Baker & Daniels*, for appellant.

*L. B. Swift* and *D. W. Howe*, for appellees.

REINHARD, J.—On a former appeal this case was reversed on account of an error of the trial court in directing a verdict for the defendants. *Neubacher* v. *Indianapolis Union R. W. Co.*, 134 Ind. 25.

The action is by Louis Neubacher against the appellant, The Lake Erie & Western Railway Company, and the Chicago, etc., R. W. Co., commonly called the "Panhandle," for damages for personal injuries alleged to have been received by Neubacher at the crossing of appellant's railroad and South Delaware street, in the city of Indianapolis. Appellant filed a demurrer to the amended complaint, which was overruled and an exception saved. There was an answer in general denial, trial by jury, and a general verdict in favor of appellee, Neubacher, and against the appellant in the sum of $3,000.00. The jury also found in favor of the other appellees, the Lake Erie & Western and the Chicago, etc., R. W. Co.

Indianapolis Union Railway Company *v.* Neubacher *et al.*

Appellant moved for judgment on the answers to the interrogatories returned by the jury, notwithstanding the general verdict, but the court overruled the motion and appellant excepted.

The errors assigned relate to the ruling of the court in overruling the demurrer to the complaint, in overruling appellant's motion, and sustaining appellee's motion for judgment on the answers to the interrogatories. The first mentioned error has been expressly waived. The second and third present the question of the appellant's liability under the amended complaint and answers to interrogatories.

It is insisted in argument, on behalf of appellant: 1. That the answers to the interrogatories disclose that the negligence upon which the jury held the appellant liable was not that or any of that charged in the complaint. 2. That the jury's answers to the interrogatories show that the appellee, Neubacher, was guilty of contributory negligence.

As to the appellant, the Indianapolis Union Railway Company, the complaint charges the following facts: That appellant had for years owned various railroad tracks in Indianapolis, crossing various streets in the city and entering the Union Depot; that for that time these tracks had joined the tracks of various other railroad companies, including those of the "Panhandle" and Lake Erie companies, whose tracks also run through said city; that such connections and tracks were the means by which such other companies reached the Union Depot with their trains; that the connecting companies pay the Union company a rental for such use of its tracks; that the "Panhandle" is a "proprietary owner" in the Union company and has representation on its managing board; that South Delaware street in said city runs north and south, east from the Union Depot, and is

crossed by two groups of tracks 100 feet apart, the southernmost group being three tracks of the "Big Four" road and the other being composed of three tracks of defendant, the Union company; that the crossing is near the center of the city and many persons and teams cross there at all hours daily; that each of said groups of tracks accommodated the business of several roads, and great numbers of engines and cars passed over that street upon those tracks at all hours daily, in engines more than 200—two-thirds of which passed upon the north group; that a gate-keeper's box stood eighteen feet north of south group and west of the street, and safety gates stood south of the south group, and north of the north group, and could be operated by a lever in the street twenty-five feet east of the gatekeeper's box; that at the time of plaintiff's injury, the defendants, the Lake Erie company and the Panhandle company, and the other companies, used the north group to get to and from the Union Depot; that an ordinance of the city required moving trains to sound the bell while moving in the city, to run at not more than four miles an hour, and, while running backward that a watchman shall be stationed at the rear end to avoid accident; that another ordinance required that safety gates shall be erected, for the protection of the public, "at each of said crossings;" that a competent person shall be employed to operate the gates, who shall be on duty from 6 a. m. to 9 p. m.; that plaintiff, a worker in brass, at about 7 p. m., November 20, 1888, was going from his home to his shop; that in so doing he went north on Virginia avenue to its crossing of the Union company's tracks, thence west along the south side thereof, upon a path which had been for a long time much used by the public generally as a highway, with the knowledge and permission of the

Indianapolis Union Railway Company *v.* Neubacher *et al.*

defendants, to said South Delaware street, a distance along the tracks of about 500 feet; that while so going west he was walking directly toward the Union Depot; that it was dark, and at the Delaware street crossing was a single gas lamp on the west side of Delaware street and near the south side of the north group of tracks; that, as he approached the crossing a passenger train of the Panhandle company, going west into the Union Depot, overtook him, moving on the south track of the north group—the track nearest to plaintiff—and that the engine of that train reached the east side of Delaware street at about the same time plaintiff reached that point; that that train consisted of an engine and several cars; that no other train was then in sight or hearing; that there was no flagman at said crossing to warn travelers of trains, nor did any of the defendants have there any means of giving such warning which was made use of; that plaintiff stood upon the east sidewalk until the Panhandle train had passed; that the safety gates were open; that no operator was at the operating station; that no attempt to close the gates was made; that no flagman was at said crossing; that no warning was given of an approaching train; that, plaintiff having been all the time looking and listening for trains, seeing and hearing none, and not knowing that one was approaching, and not being warned by defendants, or either of them, of the approach of any other train, and believing that he might safely cross the north group of tracks, walked north on Delaware street over said north group of tracks—not later than 8 p. m. of said day—when he was struck on said crossing by a train of cars of the defendant, the Lake Erie & Western Railroad Company, backing upon the said second track (of the north group) eastward by the side of the other train and hidden by it, down from said depot to

its yards, and was knocked down by the same and greatly injured (describing the injuries); that said injuries were caused without any fault of plaintiff, and were caused solely by the negligence of the defendants. After the foregoing, by way of preamble, the complaint proceeds to charge as negligence the following: That defendants, and each of them, negligently ran said trains, as aforesaid, so that the sound of the bell, if said bell was being rung, and the noise of the engine and rumble of the said Lake Erie & Western Railway train were drowned by, and were not distinguishable from the sound of the bell which was being rung, and the noise of the engine and rumble of the cars of said Chicago, St. L. & P. R. R. train; and the defendant Indianapolis Union Railway Company negligently allowed said trains to be so run; that the defendants, and each of them, negligently ran said trains, as aforesaid, so that the approach of said Lake Erie & Western Railway train to said crossing was hidden by the said C., St. L. & P. train from the plaintiff and any other person about to go upon said crossing; and the defendant, the Indianapolis Union Railway Company, negligently allowed said trains to be so run; that defendants, and each of them, negligently ran said trains, as aforesaid, so near together that the signals required by law of said L. E. & W. R. W. trains were rendered unavailing, and the defendant, the Indianapolis Union company, negligently allowed said train to so run; that the defendant, the L. E. & W. R. W. Co. negligently ran its train, as aforesaid, over said crossing, and upon plaintiff at a greater rate of speed than four miles an hour, and the defendant, the Indianapolis Union Railway Company, negligently allowed said train to be so run; that defendants, and each of them, negligently failed to have a flagman at

said crossing at said time, to warn persons about to cross of approaching trains, or to have and use any other adequate, feasible, and reasonable means of giving such warning; that defendants, and each of them, negligently failed to close said gates; that defendants, and each of them, at said time, negligently failed to have a gatekeeper at said crossing to close said gates; that defendants, and each of them, negligently failed at said time, to have, maintain, and close the safety gates on the south side of said crossing; that defendants, and each of them, negligently failed, at said time, to have at said crossing a flagman, provided with proper and conspicuous signals to warn persons about to cross of the approach of trains; that defendants, and each of them, negligently ran, or allowed to be run, said L. E. & W. train over said crossing and upon plaintiff, as aforesaid, without giving plaintiff proper and timely notice of the approach of the same; that by reason of the aforesaid negligence of defendants, plaintiff was injured, as aforesaid.

Appellant's counsel, in their brief, have separated the several acts of negligence charged in the complaint, and stated them as follows:

1. Negligently allowing two of appellant's licensees, the Lake Erie and Panhandle companies, in using its parallel tracks at Delaware street, to run a west bound train of the Panhandle (pulling head on) and an east bound train of the Lake Erie (backing) over the crossing at almost the same time, and in so doing, the Panhandle train obstructed plaintiff's view of the east bound track and of the Lake Erie train backing east thereon, and the noise of the bell of the Panhandle train and its rumble obliterated and rendered inaudible to the plaintiff the rumble of the Lake Erie train and of any warning it may have been giving by bell or otherwise.

2.   That the Union company negligently allowed these two trains to so run so near together that the signals required by law of the L. E. & W. train were unavailing.

3.   That the Union company negligently allowed the Lake Erie train to run over the crossing and upon plaintiff at a rate of over four miles an hour, in violation of the city ordinance.

4.   That the Union company (with the other defendants) negligently failed, at said time (time of the passing of the trains mentioned), to have a flagman at the crossing, or to have or use any other adequate, feasible, and reasonable means of giving warning.

5.   That the Union company (with the other defendants) at said time negligently failed to have a gatekeeper at said crossing to close the gates.

6.   That the Union company (with the other defendants) at said time, negligently failed to close the gates.

7.   That the Union company (with the other defendants) negligently failed, at said time, to have, maintain and close safety gates on the south side of the crossing.

8.   That the Union company (with the other defendants) negligently failed, at said time, to have at the crossing a flagman provided with proper and conspicuous signals to warn travelers of approaching trains.

9.   That the Union company (with the other defendants) negligently ran or allowed said Lake Erie & Western train to be run over the crossing and upon plaintiff, as aforesaid, without giving plaintiff timely notice of the approach of said L. E. & W. train.

The appellant argues that it was called to meet these issues, and none other; that if it did not (1) omit

to do, or do, or allow to be done, any of the things charged as negligently omitted, done, or allowed to be done, at the time the train of its licensee, the L. E. & W. Co., was approaching the crossing from the west on the east bound track at the time of and just before a collision between the L. E. & W. train and plaintiff, then the case made against it in the complaint was not proved, and it should have had judgment. If the plaintiff did not (2) prove his freedom from fault contributing to his injury, the appellant should have had judgment.

The jury were required to answer a large number of interrogatories, 119 in all. We shall not undertake to set them out in this opinion.

The evidence is not in the record.

Of course, every presumption is in favor of the general verdict. If there were no answers to interrogatories, the presumption would be conclusive that the evidence makes out a case in favor of the plaintiff (appellee), according to the allegations of the complaint. But it is claimed that the answers to the interrogatories establish a different case from that stated in the complaint. If this is so, the answers to the interrogatories must clearly show it, for they can be allowed to overthrow the general verdict only when there is such antagonism upon the face of the record as is beyond any possibility of being removed by any evidence legitimately admissible under the issues. *Gaar, Scott & Co.* v. *Rose,* 3 Ind. App. 269, 275; *Baldwin* v. *Shill,* 3 Ind. App. 291, 298; *Estate of Reeves* v. *Moore,* 4 Ind. App. 492; *Walter A. Wood, etc., Machine Co.* v. *Irons,* 10 Ind. App. 454, 458; *Phillips* v. *Michaels, Gdn.,* 11 Ind. App. 672; *Chicago, etc., R. R. Co.* v. *Zimmerman, Admx.,* 12 Ind. App. 504; *Louisville, etc., R. R. Co.* v. *Cronbach, Admr.,* 12 Ind. App. 666, 674.

It is a familiar rule that every case must proceed upon some definite theory, and that if a complaint is based upon one theory it cannot be sustained upon some other. The allegations and the proof must correspond, else there can be no recovery. *Becker* v. *Baumgartner*, 5 Ind. App. 576; *Louisville, etc., R. R. Co.* v. *Godman*, 104 Ind. 490; *Evansville, etc., R. R. Co.* v. *Barnes*, 137 Ind. 306.

Hence, the negligence charged in the complaint, or some of it, must be made out by the evidence. It is not sufficient to prove some other negligence with which the defendant might have been, but was not charged.

It was charged in the complaint that the train which struck the appellee and inflicted his injury was a Lake Erie & Western train. The answers to the interrogatories state that the jury do not know what train it was, nor whether it was a passenger or freight train. This we regard as equivalent to a finding that there was no evidence that the train which ran upon the appellee was a Lake Erie & Western train, and hence it must be admitted, we think, that that portion of the complaint which alleges that the appellee's injuries were received from a Lake Erie & Western train was not established. It is not essential, however, that every averment in a complaint should be proved. It is sufficient if the material allegations be establishhed. Was this such an allegation as was required to be proved as laid?

We do not regard the allegation as to the identical train that injured appellee as material. All the trains in and about the Union Station were operated under the directions of the appellant. It was just as responsible for one as the other. Whether the appellant allowed a Lake Erie train or a train belonging to any

other company to commit the negligent act is of no consequence, if it permitted it to be done at all and the consequences ensued which are charged in the complaint.

If the appellant had owned all the trains that were being operated in and about the Union Depot, and it had been averred in the complaint that the train which injured the appellee was train No. 5, when in fact it was train No. 4, we apprehend it would hardly be claimed that this was a fatal variance. So, in this case, the name or description or ownership of the train cuts but little, if any figure. The gist of the action did not lie in the infliction of the injury by reason of the ownership of the particular train that ran into the appellee. The complaint would have been good as against appellant without stating whose train it was.

The appellant's duty was to see that none of the trains were operated in such a way that the signals required by them, or any one of them, were unavailing; not to permit such trains to be run at a greater speed than four miles per hour; to have a flagman at the crossing and to use other adequate means of giving warning; to have a gatekeeper to open and close the gates at the crossing when proper; to see that the gates were closed when a train was about to pass the crossing; not to allow any train to run over a crossing and upon a pedestrian thereat without giving the required notice of the approach of such train. The violation of these duties were the fundamental charges contained in the complaint and which the appellant was required to meet, and not the averment as to the particular kind of train it was which ran upon the appellee, or to whom it belonged, or how it was numbered or otherwise described, and the question is, to what extent, if any, were these charges established?

In view of the fact that the appellant had a large number of parallel tracks at its station, and was in the very nature of things required to operate and cross over these tracks some 200 trains daily, some of which would be likely to cross at the same time and in opposite directions, and in view of the fact that many bells might be ringing, and whistles blowing at the same time, because of these and other matters, showing the great and constant danger to pedestrians and others desiring to pass said crossing at any time, it became necessary, as alleged, to adopt greater precautions than might have been otherwise required. The gist of the negligence, then, was in failing to adopt the necessary and required precautionary measures, in doing, or omitting to do, acts which induced appellee to go upon the crossing when it was unsafe by reason of an approaching train, and in violating the ordinances as to maintaining gates and concerning the rate of speed at which trains should run. The presumption prevails (in the absence of the evidence) that all these things were proved, unless it be overcome by the direct finding of the jury in the answers to interrogatories.

If we grant that the jury's finding is such that no recovery can be had upon the alleged negligence in allowing the running of the trains at an illegal rate of speed, there is still enough left not to antagonize the general verdict as to other negligent acts charged. The general verdict is a finding in favor of appellee on every material point, and unless the answers to interrogatories come squarely in conflict with it upon some point or points material to the recovery, the general verdict must stand, although it is in conflict, in other respects, with such answers of the jury.

The same is true respecting the question of contributory negligence. Antecedent to any verdict, it is

true that, under the authorities in this State, there is a presumption that one who was hurt at a railroad crossing by a passing train was negligent.  *Smith* v. *Wabash R. R. Co.*, 141 Ind. 92.  This presumption, however, is overcome by the general verdict.  Whenever such verdict is returned and approved by the trial court the presumption named ceases to exist and gives way to the contrary presumption that everything has been shown to entitle the plaintiff to such a verdict.  Hence, if the defendant asserts that the verdict is wrong because of a variance between the complaint and the proof, or because the plaintiff was guilty of contributory negligence, the burden is upon such defendant to establish the assertion.  This may be done, we grant, by the answers of the jury to interrogatories, but these must disclose such a state of facts in relation to the variance or contributory negligence of the plaintiff, as will clearly antagonize the general verdict and overcome the presumptions attending it.

The answers to interrogatories show the following as to the place and manner in which appellee was injured:  Delaware street is ninety feet wide, runs north and south, and crosses Pogue's run at a point 450 feet west of the intersection of Virginia avenue and Alabama street, 450 feet east of Pennsylvania street, 1,170 feet east of the west side of Meridian street (east end of Union Depot), and all of these streets (Virginia avenue excepted) run parallel to Delaware street.  South of Pogue's run, Delaware street was crossed by a group of three tracks, known in this case as tracks Nos. 1, 2 and 3, and north of that stream by a group of five tracks, known in this case as tracks Nos. 4, 5, 6, 7 and 8.  The two groups were separated by a bridge over the stream 100 feet long and of the

full width of Delaware street, including its sidewalks. The south group of tracks was in no way connected with the accident. The north group consisted of parallel tracks. No. 4 was next to and twelve feet north of the bank of Pogue's run; No. 5 was 7 3-10 feet north of No. 4, and No. 6 was 7 5-12 feet north of No. 5, and from track 6 to the north "safety gate" it was 6 feet. Nos. 7 and 8 were further north, and had been abandoned as railroad tracks and cut off from any railroad connection long before the accident. These tracks were all standard gauge, 4 feet 8 inches. Track 4 was the Union company's west bound main, and track 6 was a Panhandle switch. Tracks 4 and 5 ran parallel and straight, upon about a level grade from Alabama street to a point about 90 feet west of Pennsylvania street. Appellee walked along this 12 foot strip of ground north of Pogue's run and south of track 4 from the intersection of Virginia avenue (a diagonal street) and Alabama street, to the east sidewalk of Delaware street. When he reached that point a Panhandle passenger train going west on track 4, consisting of an engine at the west end, and four or five cars, overtook him and he stopped on the east sidewalk and stood about six feet south of track 4 to allow that train to pass him. Its headlight was burning and was casting its light to the west; its bell was ringing and it was running at about four miles an hour. He stood there until the rear car of the Panhandle train had passed him about two feet, and then walked directly north, on the east sidewalk, over track 4, and the space between that and track 5, without stopping, and while he was crossing track 5, was struck by the east end of the east car of a train backing east on that track, after dark, between 6:30 and 7 p. m. Plaintiff had passed over the crossing almost daily—by day and night—for years, but had ob-

served that safety gates were operated by day, and that at night a flagman, with red lamp signal, was used instead of the gates. As he came west to Delaware street, and while he stood there he observed that the south safety gate was open and was not operated for the passage of the west bound train, and it was so dark that he could not see the south gate, and knew nothing about whether it was being operated or not. At the time the west bound train crossed over and when the train which struck appellee was crossing, and while appellee was attempting to pass the crossing, the appellant's flagman was on Pogue's run bridge, "flagging trains," but the appellee failed to see him. Appellee, as he stood waiting for the west bound train to pass him, knew that it was—while near him—between him and track 5, and that it cut off the view of that track and of trains thereon, if any, and he knew and had in mind that the noises made by the west bound train might prevent his hearing the noises made by any train that might be coming east on track 5. It was the practice of the appellant, on the day of the accident, and for several months prior thereto, to operate the two safety gates at the Delaware street crossing named in the complaint, as a warning to travelers on the street, from 6:30 o'clock a. m. until dark, and from dark until 9 o'clock p. m. to substitute a flagman with a red lantern, who would signal with such lantern to travelers on the street when the crossing was not safe, but appellee did not know this. The ordinance, however, required the appellant to operate the safety gates at all times when trains were passing, up to 9 o'clock at night. The appellee received no signal or invitation to cross or not to cross from the flagman, except that the gate was open. As soon as the west bound train had passed him, the appellee started to cross the tracks north, and when he had

reached track 4, on which the west bound train had passed, said train had only passed him by eight feet.

The jury, in answers to interrogatories, also stated that if appellee had waited on the south side of track 4, or upon track 4, until the west bound train had moved farther west (how far west or how long the appellee should have waited they do not state), he could, by looking and listening, have seen and heard the east bound train in time to avoid the injury. They also found that he did not hear the east bound train because of the confusion of noises of the two trains, and he did not see it because the west bound train obstructed his vision. They expressly found that he looked both east and toward the Union Station (west) after starting across the track.

In answer to a question the jury also stated that they did not know why appellee did not see the train with which he collided in time to avoid it; and to another question, they answered that the train was not in plain sight.

We do not think the answers to the interrogatories conclusively show a case of negligence different from that stated in the complaint. It is shown that at least one of its legal duties was violated by the appellant as charged, viz: the duty of opening and closing the safety gates. There is nothing to show that the appellant was exempt from the performance of this duty after nightfall. On the contrary, it was its duty to operate the gates till 9 o'clock p. m. It is true appellee did not pass through the north gate himself, but when he saw it open, in the absence of a clear showing that he knew it was not being operated at night, he had the right to assume, we think, that it was safe to pass over the tracks, else the appellant would have closed the gate.

It is also true, as appellant's counsel contend, that

appellee saw the gate remain open while the west bound train was passing, but this was not conclusive evidence that the gate was not being operated. Just what the effect of such knowledge was we cannot say, as it was a question for the jury. The appellee saw no flagman and saw no signal of danger. Did he not have the right to assume, therefore, that it was safe for him to cross? The jury had a right to conclude that he did.

A feature of the negligence charged, or, perhaps, more correctly speaking, a reason for the requirement of special precautionary measures, was the running of trains so closely together on the tracks as to cause the noises made by such running to prevent a person attempting to cross, from hearing the distinct sound of the approaching train or its signals. To permit such noises and the passing of trains at such short intervals was not necessarily negligence, but it necessarily created additional danger to the pedestrian who might desire to cross, and brought with it the necessary requirement of providing such signals of warning as would be sure to apprise travelers over the crossing of the approach of trains. One of the precautionary measures was the ordinance requiring safety gates to be erected and operated. The failure to maintain and operate them, there, up to 9 o'clock at night, was in plain violation of the ordinance and was negligence. This negligence was charged in the complaint, and it is not shown that there was any failure to prove it. Even if it had been permissible to substitute the flagman before 9 o'clock, it was not shown that the latter gave any available signals.

Under the circumstances, we also think the question of contributory negligence was one for the jury. The mere fact that the appellee did not wait until the west bound train was so far out of the way as to en-

able him to see and hear whether a train might not be approaching from the west was not necessarily negligence. Whether it would or would not be negligence contributory to the injury is owing to the peculiar circumstances surrounding the occurrence. There might have been a number of reasons why it would not have been prudent for him to wait. He might have been confused by the lights or other objects, as the jury found, and indeed, for aught that appears, there might have been engines on the tracks which rendered it necessary for him to act promptly. It is not claimed that the appellee failed to look and listen as far as it lay in his power to do so. Indeed, the contrary is directly found. The chief complaint seems to be that he did not wait for the west bound train to get so far beyond him as to enable him to ascertain whether a train was approaching from the west to the east. The fact that the safety gate was open was an indication that no train was approaching. *Pennsylvania Co.* v. *Steigmeir*, 118 Ind. 305. When the facts and circumstances are such as to have a tendency to mislead one about to pass such a crossing, the law will not hold him to that strict accountability that it would under ordinary conditions. In all such cases the question of contributory negligence is for the jury. *Grand Rapids, etc., R. R. Co.* v. *Harrington*, 131 Ind. 426; *Mayo* v. *Boston & Maine Railroad*, 104 Mass. 137.

It is expressly held in the case last cited that the mere fact that one passing over a railroad track at a highway crossing begins to cross at a time when his view along the tracks is obstructed by the departing train, is not conclusive that such person did not use due care. Precisely the same point was also decided in *Philadelphia, etc., R. R. Co.* v. *Carr*, 99 Pa. St. 505. In that case the court was asked to charge the jury as

follows: "The fact that a traveler stops and waits until a passing train gets by does not absolve him or her from looking and listening for trains approaching upon the other track in an opposite direction, and a traveler waiting for a train passing in one direction, must wait sufficiently long so that the train shall not prevent him or her seeing a train approaching in an opposite direction. If, therefore, the jury believe that Mrs. Carr, after stopping east of the railroad at Diamond street while the out train was passing, started across at a time when that train prevented her seeing the incoming train, she was guilty of negligence, and cannot recover."

The court below refused to give this instruction, but charged as follows: "I have already told you that it was Mrs. Carr's duty on approaching the track with a view of crossing it, to look and listen, to look in both directions, and listen for the approach of trains on either side, and I also said, or it was a necessary inference from it, that if she was delayed in this case, by any cause—the approach of the up train in the case in hand—it would be her duty again to look in both directions and listen before setting out. I am asked to say to you, however, that if under those circumstances a train which passed up the road shut out any portion of the road from view, it would be her duty to wait until that obstacle to vision was removed, and that if she did not do so, it would necessarily be negligence, and preclude her recovery. What I say is, that it would have been a wise and proper precaution, as the event shows. Whether the omission of that precaution be negligence would depend upon circumstances, and I am not willing to take upon myself the responsibility of saying that under the circumstances in this case she would necessarily be guilty of negligence in not waiting until the view of the other track

was entirely clear. That is for the jury to consider. If the jury find that she was negligent, then the consequence would follow which has been already stated."

The Supreme Court upheld this instruction, saying: "The learned judge said all that could be said when he charged, that the act of the plaintiff in crossing as she did, might be negligent according to the circumstances, and the force of these he properly left to the determination of the jury. In this there was no error. We think the time has arrived when it would be well for all railroad companies, whose tracks cross the streets of cities and towns at grade, to protect all the street crossings with gates. The growing practice in this direction deserves commendation."

Although the question as to what constitutes "due care" on the part of one about to pass over a railroad crossing is a legal one, such person being required to listen for signals, notice warning signs, and look attentively both ways for approaching trains, yet whether the surroundings are such as to admit of these precautions is always a question to be determined by the jury, except in cases where all the ultimate facts have been found in a special verdict, and where only one inference can be drawn from such facts. *Cincinnati, etc., R. W. Co.* v. *Grames*, 136 Ind. 39; *Smith* v. *Wabash R. R. Co., supra.*

In the case at bar there is no special verdict, the large number of interrogatories and answers thereto being supplemental to the general verdict only. There is nothing in the answers to the interrogatories which necessarily leads to the conclusion that if the appellee had properly exercised his faculties he would not have been hurt. It is difficult to lay down any rigid rule as to the exact moment a pedestrian who desires to pass a crossing of the character of the one

we have here to deal with, must start after a train has passed, or how long he shall be required to wait. With the large number of trains and individual engines that almost constantly pass over these tracks, it would be a harsh rule indeed which would require the traveler to wait until such train had gone a sufficient distance to enable him to see if another was coming from the direction which the passing train had taken, as in the time thus required there might be engines or cars approaching from the opposite direction, and if he were compelled to wait till all had passed, it might never be possible for him to cross without incurring the risk of being chargeable with contributory negligence.

We have here a crossing containing a large number of parallel tracks upon which trains and single engines are constantly passing and repassing, to the number of hundreds in a single day. The circumstances attending the attempt to pass such a crossing are of course entirely different from those which usually prevail at a crossing in the country, or even in a city where the track is but a single or double one. The rules sought to be invoked by appellant's learned counsel as to the quantum and kind of care required of a traveler about to go over a crossing are not so arbitrary or unbending as to be equally enforcible under all circumstances and in every surrounding. Such rules are enforced only when the circumstances make them reasonable. 2 Sher. & Redfield Negl. (4th ed.), section 477.

That in such cases the question of negligence or contributory negligence is usually one for the jury, see further: *Young* v. *Detroit, etc., R. W. Co.*, 56 Mich. 430, 23 N.W. 67; *Geveke* v. *Grand Rapids, etc., R. R. Co.*, 57 Mich. 589, 24 N.W. 675; *Vicksburg, etc., R. R. Co.* v. *Alexander*, 62 Miss. 496; *Kellny* v. *Mo.*

*Pac. R. W. Co.*, 101 Mo. 67, 13 S.W. 806; *Adams* v. *Iron Cliffs Co.*, 78 Mich. 271, 44 N.W. 270; *Smith* v. *Savannah, etc., R. W. Co.*, 84 Ga. 698, 11 S. E. 455; *Bare* v. *Pennsylvania R. Co.* 135 Pa. St. 95, 19 Atl. 935.

Judgment affirmed.

## On Petition for Rehearing.

Reinhard, J.—Appellant's learned counsel make a strong and plausible argument in their brief on petition for a rehearing in support of the position that appellee was shown to be guilty of contributory negligence in attempting to pass over the railway crossing so soon after the passing of the west bound train, and at their urgent insistence we have given the questions involved a second careful consideration. There is much to be said, it must be admitted, in favor of the position taken by counsel, and there are cases which, in a general way, and without careful analysis, would seem to go far toward supporting their view.

As to the question of the identification of the train which it is charged inflicted the injury upon the appellee, counsel contend that in view of the jury's answer to an interrogatory in which it is stated that they did not know what train it was that ran upon the appellee, that it is impossible for this court to hold properly that such train was a train belonging to one of the lessees of the appellant—a fact which it was probably necessary for the jury to find before they could find a verdict against the appellant. But we do not think, on the other hand, that it would be proper to presume, in the face of the general verdict, that the train was one that had no right at all to enter the depot—in other words, that it was "a trespassing train," as counsel want us to assume. The evidence is not

in the record, and we are not permitted to look to it for information. If it was essential to prove that the train was one of those operated within the Union belt and under the control of appellant, this finding must be deemed by intendment to be included in the general verdict, and the answer of the jury that they did not know what train it was, would not necessarily contravene or overcome such presumption. It may have been proved upon the trial that all the trains running into and out of the Union Depot are trains of appellant's lesees, and are operated by appellant, or under its direction. If so, the evidence was sufficient upon that point. There was no fatal variance between the case made by the answers to the interrogatories and that counted upon in the complaint, as to this point.

We pass then to the question of contributory negligence. If failing to wait for the train to pass a sufficient distance to enable appellee to see whether another train was approaching, was negligence on the part of appellee, it must have been so because the peculiar condition of affairs required him to wait. But we cannot say, in view of the general verdict, what all the conditions were. It must never be forgotten that we are not dealing here with a special, but a general verdict, and answers to some interrogatories. The learned counsel treat this controversy throughout as if the interrogatories and answers thereto constituted a special verdict, and the jury had not returned a general verdict at all. They even controvert the proposition, if we understand them correctly, that it was our duty to indulge in any presumptions in favor of the general verdict, a matter we shall notice more particularly hereafter. In connection with the counsel's insistence that the appellee was in duty bound to wait till the west bound train had passed beyond

the point at which it obstructed the view of the train that struck appellee, counsel think we gave too much weight to the fact that the safety gate stood open, and insist that we are in irreconcilable conflict with the case of *Smith* v. *Wabash R. R. Co.*, 141 Ind. 92. Counsel say: "In that case, the traveler knew a flagman guarded the crossing; he was accustomed to depend upon his signals; he did not know that the flagman went off duty at 6:30 p. m., and when he approached between 6:30 and 7 p. m. he looked for the flagman, and not seeing him believed his nonappearance indicated that he was in his flaghouse and therefore no train was then approaching. Upon this assumption he went on, relying upon the fact that the flagman did not warn him, as an invitation to cross. Yet the Supreme Court, even in that case, held that the plaintiff's duty of care was the same as it would have been had the crossing never been guarded by a flagman, and that his driving on, without looking out for himself, was negligence *per se*, to be passed upon as such by the court."

One of the material features by which the case cited must be distinguished from the case in appeal, is that in the former there was a special verdict, while in the latter there was not. As the court there very properly say: "Unless all the facts essential to a recovery by appellant are found in the special verdict, there was no error in rendering judgment thereon in favor of appellee." The learned counsel will hardly contend that the circumstances and conditions of the place of the injury were shown to be alike, or even similar in the two cases. In the case relied upon, the crossing was on Main street, in the city of Danville, Illinois, "the principal thoroughfare east and west through said city." The plaintiff in that case sought to excuse himself from looking and listening in the direction from

which the train was approaching, and of which a clear view could have been had by him if he had looked, and the train heard, had he listened, the track being unobstructed for some distance, by the fact that the safety gate was open and the flagman was not there, treating the open gate as an invitation to cross, upon which he had a right to rely. The court said: "The appellant did not look or listen after the first time, when he was 100 feet from the crossing. He had an unobstructed view to the north, could have seen if he had looked, and could have heard if he had listened. The surroundings were such as to admit of his looking and listening. He neglected these precautions, and, by reason thereof was injured," etc.

In the case at bar, we have no such conditions as these. Indeed, it may be truthfully said that the very opposite was true, as appears even from the answers to interrogatories, without resorting to the indulgence of any presumptions on account of the general verdict. Here "the surroundings were" not "such as to admit of his looking and listening," but it is expressly found by the answers to the interrogatories that the confusion of noises was such as to render it impossible for him to hear. Looking could not avail him because the west bound train was in the way, although the jury found they did not know why he could not see, and that the train was not in *plain* sight. But they also found that the appellee did look, in both directions, after he had started across the track. It would require an extraordinary process of reasoning to lead the ordinary mind to the conclusion that the conditions were shown to be practically similar in both cases. It must be remembered, too, that in the present case there was a large number of tracks upon all of which engines and trains were almost constantly passing, and it is impossible to lay down any rule

which would require a pedestrian, in such circumstances, to wait during any certain period of time after the passing of a train before undertaking to cross the track, otherwise he might never be able to pass over it at all. From anything that appears in the answers to interrogatories, as stated in our former opinion, other cars or engines might have been approaching from the opposite direction or from the same direction of the train that struck appellee, which would have made it exceedingly hazardous for him to remain longer at or near the place from which he started to cross the track. So long as the company maintains its crossing at grade with the public streets the footman certainly has some right to expect that it will adopt special precautionary measures to prevent injury from passing trains. Under these circumstances we think the jury was justified in taking into consideration the fact that the safety gate stood open and that no danger signals were given. There is no conflict between the case relied upon and the case at bar in respect of the question just considered.

The next contention of the appellant's learned counsel is introduced by them, in their brief, as follows: "The court has announced in the case in appeal that a general verdict for plaintiff raises a presumption that it was proved that the plaintiff was, at the time of injury, not guilty of contributory negligence and that the defendant, upon appeal, if he would overcome the effect of the general verdict, must make it appear that the plaintiff was guilty of contributory negligence, or the verdict will stand. If this is the law, the case of *Cincinnati, etc., R. W. Co.* v. *Howard*, 124 Ind. 280, was not properly decided. In that case, there was a general verdict. The defendant (appellant) did not attack that verdict with evidence or facts found, showing, or even tending to show that the plaintiff was guilty of

contributory negligence. It went to the Supreme Court merely with the proposition that the plaintiff had been allowed to go to the jury without proof as to what care she was exercising or what she was at the time doing, and therefore the jury could not say upon the proofs whether or not the plaintiff was negligent. * * * The Supreme Court did not find that this verdict, which had been 'approved by the trial court' raised any countervailing presumption in plaintiff's favor, but merely applied the rule that the evidence did not warrant the jury in holding that the plaintiff was exercising due care, and, even at that stage of the case, after verdict and approval of it by the trial court, reversed the case upon the strength of the presumption of negligence in the plaintiff."

With all respect for the ability and standing of the learned counsel, we cannot refrain from expressing our surprise at this attempt to establish an analogy between a case where the error relied upon is the overruling of a motion for a new trial, owing to the insufficiency of the evidence to sustain the verdict, and one in which the evidence is not in the record, and answers to interrogatories are relied upon to overthrow the general verdict. We are in full accord with the doctrine invoked by counsel that one who is injured at a railroad crossing by a passing train is *prima facie* guilty of contributory negligence, and must adduce some testimony to establish his freedom therefrom before he can recover damages for the negligence of the railroad company. In our original opinion we expressly stated this to be the rule, but said that this presumption no longer prevailed after the general verdict and its approval by the judgment of the trial court. It is as to the latter part of this proposition that appellant's counsel take issue with us and assert that it is in conflict with the ruling of the Supreme

Court in the case of *Cincinnati, etc., R.W. Co.* v. *Howard,* *supra.* That we were correct in our view as to the rule stated we entertain not a shadow of doubt. What we said on that subject was of course with special reference to a case like the present one, in which the evidence is not to be looked to in the solution of the question before us. But even if the question involved should arise on the sufficiency of the evidence, it cannot be successfully maintained that the burden of showing its sufficiency is upon the appellee, otherwise there would be no necessity of the appellant's bringing before this court the record of the evidence at all, and that task would devolve upon the appellee. All the appellant would be required to do would be to assert that the evidence was insufficient to establish the plaintiff's freedom from fault and throw the burden on the appellee to establish due care, precisely as he is required to do in the trial court. It seems to us that it requires no argument to establish the fallacy of such a proposition. Every lawyer who has had experience in appellate practice knows that error is never presumed upon any ground, but that the presumption is always in favor of the correctness of the judgment of the *nisi prius* court, until the appellant has succeeded in showing by the record wherein the court has erred. We grant that in the determination of the errors relied upon, the appellate tribunal may and must, in proper instances, invoke the rules of law governing the lower court. Thus, if the error relied upon is the insufficiency of the evidence upon any given point, and it appears affirmatively that all the evidence is in the record, the Appellate Court must determine whether there was enough evidence before the trial court or jury upon the point in dispute to authorize them to make the finding that was made. In determining that proposition, the appellate tribunal

will, of course, apply the rule that there is in the out-
set a presumption that the plaintiff was negligent,
and it will determine whether the lower court cor-
rectly held that there was sufficient evidence to over-
come such presumption. In other words, the appel-
lant overcomes the presumption that there is no error
by showing by the record of all the evidence adduced
below that such evidence was insufficient; or, to be
more accurate, that, upon the question involved, there
was no evidence which warranted the jury or court to
find as it did. In practice, as a matter of course, this
court, or the Supreme Court, does not find it necessary
generally to draw the distinction in the method of ap-
plying the rule as to presumptions between the Appel-
late Court and the trial court. Thus, in the case of *Cin-
cinnati, etc., R.W. Co.* v. *Howard, supra,* with which it is
contended we are in conflict, it was not necessary for
the Supreme Court to declare that in considering the
sufficiency of the evidence it would first indulge the
presumption that everything done by the lower court
was regular, that the judgment was right, that every
ruling of the trial court was proper, that the evidence
upon every point necessary to make out a case was
sufficient. And yet this is precisely the rule upon
which that court acted, and always acts in such cases,
notwithstanding the fact that it does not in every
case reiterate the rule. There are some things, even
in the decisions of cases on appeal, which must be
taken for granted, and when a principle of practice
has become so universally accepted as the one in con-
sideration, courts will not feel called upon to an-
nounce it every time even though no question has been
raised concerning it. In the case cited, the appellant
had the burden of showing the insufficiency of the evi-
dence in the particular respect in which it was claimed

to be insufficient. To remove this burden the appellant was required to properly bring the evidence before the court, to show that it was *all* the evidence given, to discuss the point in the brief, and to do everything which the law prescribes should be done to accomplish that object. It is then, and not till then, that the court will examine the record and apply the rules of presumption applicable in the court below. And even then it will, as a general rule, only look for such defects in the evidence as are pointed out in the brief and supported by the record, the presumption of regularity adhering throughout until the assertion of the contrary has been made good by the record.

In the Howard case, it is literally true, as appellant's counsel assert, that "the Supreme Court did not find that the verdict which had been 'approved by the trial court,' raised any countervailing presumption in plaintiff's favor;" but that principle was unquestionably given its full application, notwithstanding the silence of the court upon the subject. It was not necessary for the court to declare that the points were properly raised in appellant's brief, that the bill of exceptions was presented to the judge and filed within the proper time, duly certified by the judge, that the transcript was properly certified by the clerk, and duly filed in this court; that it was duly shown that *all* the evidence given in the trial court was brought into the bill of exceptions, etc., etc. The court tacitly found that all the steps necessary to overcome the presumption referred to had been taken. Having found this impliedly the court proceeded to examine the evidence in the record, and finding it insufficient, declared it to be so, and, in connection therewith, enunciated the rules which the trial court should have applied, and which, if it had applied,

must have led that court to sustain the motion for a new trial.

To hold that there is no presumption in favor of the verdict and judgment of the trial court, on appeal to this or the Supreme Court, would be to entirely change the character of the proceedings obtaining here, as well as the character of the court itself. Unless such a presumption is indulged, the appeal is governed by the same rules as those prevailing in appeals from a justice of the peace to the circuit court, where the case on appeal is tried *de novo*. There the judgment and its incidents have no presumptive force whatever, and the cause is tried the same as if no trial had ever been had and no judgment had ever been rendered. Not so, however, with appeals from the circuit to this or the Supreme Court. Here no causes are tried *de novo*. The record is brought here only for review and to determine whether the trial court committed any legal error in its rulings, and not for trial. Whatever may be the mode and nature of appeal, whether the case is brought here on reserved questions of law, or to review the evidence, the presumption of the regularity of the judgment, and every ruling behind it or incident to it, stands as a bulwark for the protection of the appellee, until overthrown by the recitals of the record to the contrary. Says Judge Elliott: "The rule that all reasonable presumptions and intendments will be made in favor of the rulings of the trial court is one of the best settled and most frequently applied rules in appellate procedure. The rule rests on a firm foundation. It is supported by the elementary principle that official acts are presumed to be rightfully performed. But when it is brought to mind that a court acts impartially, upon full information and with a calm deliberation, the foundation of

the rule stated will at once be perceived to be broader and stronger than that which underlies the rule supporting the acts of ministerial or executive officers." Elliott's Appellate Procedure, section 711.

The presumption is, of course, not conclusive, and may always be rebutted. But it is "of such strength as to cast upon the party who assails the rulings of the trial court the burden of making it clearly appear that the rulings were wrong." Id., section 710.

"It will be assumed on appeal, in cases where the record is silent, that the preliminary steps necessary to impart vitality and force to a judgment were duly taken." Id., section 718.

And "it will be presumed," says the same author, "that jurors have rightfully performed their duty and have returned a true verdict according to the law and the evidence. The general doctrine is declared and enforced in the many scores of cases which hold that it will be assumed that the verdict is supported by the evidence and that the jury properly decided the controversy in cases where the evidence is conflicting. * * * In short, all reasonable intendments will be made in order to support the verdict where the record contains nothing sufficient to justify its overthrow, and this doctrine is nothing more than a reasonable application of the general rule that a breach of sworn duty must be clearly shown." Id., section 724.

But if this rule is so universally applicable in cases where the evidence is in the record, and the judgment is assailed because of the insufficiency of such evidence, how much greater reason is there for giving it force where the evidence is absent and the only thing relied upon to overthrow the general verdict is the finding of the jury in answer to interrogatories submitted to them. So often has the rule been reiterated

that, in order to override the general verdict, the answers to interrogatories must be absolutely repugnant to and in irreconcilable conflict with the former, and that such antagonism must appear on the face of the record beyond the possibility of being removed by any evidence legitimately admissible under the issues, that we had supposed it was no longer a subject for legitimate controversy. But to deny the duty of this court to indulge the presumption to which we have alluded, or make the intendment in favor of the general verdict, is asking it to strike down the rule just referred to, and treat the answers to the interrogatories as a special verdict, thus ignoring the existence of the general verdict absolutely. That the court will not presume anything in favor of the special findings of a jury as against a general verdict, but will make every reasonable presumption in favor of the general verdict, as against the answers to the interrogatories, see: *McCallister* v. *Mount*, 73 Ind. 559; *Cook* v. *Howe*, 77 Ind. 442; *Pittsburgh, etc., R. W. Co.* v. *Martin*, 82 Ind. 476; *Lassiter* v. *Jackman*, 88 Ind. 118; *Baltimore, etc., R. R. Co.* v. *Rowan*, 104 Ind. 88; *Sanders* v. *Weelburg*, 107 Ind. 266; *Redelsheimer* v. *Miller*, 107 Ind. 485; *McComas* v. *Haas*, 107 Ind. 512; *Ft. Wayne, etc., R. W. Co.* v. *Beyerle*, 110 Ind. 100; *Rice* v. *Manford*, 110 Ind. 596; *City of Greenfield* v. *State, ex rel.*, 113 Ind. 597; *New York, etc., R. W. Co.* v. *Grand Rapids, etc., R. R. Co.*, 116 Ind. 60; *Chicago, etc., R. W. Co.* v. *Hedges*, 118 Ind. 5; *Smith* v. *Heller*, 119 Ind. 212; *Louisville, etc., R. W. Co.* v. *Creek*, 130 Ind. 139; *British American Assurance Co.* v. *Wilson*, 132 Ind. 278; *Evansville, etc., R. R. Co.* v. *Gilmore*, 1 Ind. App. 468; *Black* v. *Haseltine*, 3 Ind. App. 491; *Vance* v. *City of Franklin*, 4 Ind. App. 515; *Chicago, etc., R. R. Co.* v. *Brannegan*, 5 Ind. App. 540; *Cleveland, etc., R. W.*

*Co.* v. *Johnson,* 7 Ind. App. 441; *Rittenhause* v. *Knoop,* 9 Ind. App. 126; *Lake Erie, etc., R. R. Co.* v. *McHenry,* 10 Ind. App. 525; *Indianapolis Union R. W. Co.* v. *Ott,* 11 Ind. App. 564; *City of Fort Wayne* v. *Farnan,* 13 Ind. App. 536; *Keeley Brewing Co.* v. *Parnin,* 13 Ind. App. 588.

And so we think it indisputably true, under our practice, that the general verdict will be aided by every reasonable intendment, while the contrary is true as to the answers to interrogatories. Hence we are still of opinion that there is a presumption in favor of the correctness of the general verdict, and that there is nothing in the case of *Cincinnati, etc., R. W. Co.* v. *Howard, supra,* nor in the case of *Smith* v. *Wabash R. R. Co., supra,* with which our ruling comes in conflict. We do not for a moment question the doctrine enunciated in those cases, that the burden is upon the injured party to overcome the presumption of negligence on his part, but we say that he has overcome that presumption by the verdict of the jury, approved by the judgment of the trial court, and having done that, it now devolves upon the appellant to show by the recitals of the record that such verdict was wrong.

It is also complained that we have "misconceived the effect of the findings of the jury as to Neubacher's knowledge that the gates were not being used." We have not attached, and do not now attach much importance to the position of the gate pole, except that it was a circumstance which the jury had a right to consider. Counsel will agree with us, we think, that as a general rule the open gate is an invitation for parties to cross, but we did not hold in our former opinion that it would be so under all circumstances, and that the appellee need not otherwise make use of his faculties if he saw the gate open. If he could see and hear the train, he was bound to do that, and could

not depend upon the open gate, and the failure to put out danger signals. But it was a question for the jury to determine whether, under the peculiar circumstances of this case, he had a right to place any reliance upon the open gates and the absence of danger signals, and the fact that the appellee knew the gate was not put down while another train had passed that crossing, would not of itself abridge or abrogate the right of the jury to so decide when they considered that circumstance with all others before them. Appellee knew that the gate was not closed while the train passed going west, but he did not know, and could not have known what happened that evening in connection with the gate before he arrived there. At least there is no finding that he did know that the gate was not operated. We do not know what other facts and circumstances the jury had before them by which they arrived at the conclusion that appellee exercised due and proper care. The appellant's counsel admit that the jury found that although appellee had frequently passed there before, he did not know whether the gates were closed or a flagman was employed at night or not. If he did not know, and saw no danger signals, but saw the open gate, and otherwise used such precautions as a man of ordinary prudence having regard for his personal safety would use, as the jury necessarily found by their general verdict, we are not at liberty to say that such finding was unwarranted in view of the answers to interrogatories.

It is urged, however, that we have in effect overruled or refused to follow the recent case of *Oleson* v. *Lake Shore, etc., R. W. Co.*, 143 Ind. 405.

As we have not the slightest inclination to come in conflict with the rulings of the Supreme Court, and as we understand our duty to be to follow instead of overruling its decisions, we have made a careful ex-

amination of the case referred to in order to ascertain whether some new principle of law had been there enunciated which had escaped our attention in the original decision. The opinion of Monks, J., in that case, contains an able and accurate presentation of the legal rules applicable to the facts established by the evidence, and after a careful examination of that opinion we are unable to find in it anything in conflict with our views of the law as declared in the original opinion in the present case. In the case referred to, the facts were undisputed and, as the court expressly found, but one inference could be drawn from them, which inference was, of course, for the court and not for the jury to draw. The trial court, after the plaintiff had concluded his evidence, directed a verdict for the defendant, and the Supreme Court held that this was proper. The plaintiff's injury in that case, as in the present, occurred at a grade crossing by being struck by a moving train as he attempted to pass over such crossing on the highway. The station at or near the crossing was a small one, and the roadbed contained but two main tracks. The railroad ran east and west and the highway north and south. There was another highway which ran east from the first named, immediately south and adjoining the right of way of the railroad. The north track was for east bound trains and the south track for west bound trains. Trains frequently passed each other at the crossing. All of this he knew, as he lived near the railroad. The plaintiff was going west on the east and west highway, driving a horse attached to a light wagon, sitting sideways on a board between the wheels of the wagon, with his face to the south. As he turned north upon the highway which crossed the track north and south, he faced to the north, and looked both ways, east and west, when he saw a

freight train about 400 feet west on the crossing and west of the depot coming from the west and going east on the north track. He stopped about forty feet from the south track and waited till this train going east had passed. He looked to the east, but saw no train. He could not see over a half mile to distinguish objects, the day being somewhat dark and cloudy, the wind blowing from the northeast. The smoke from the engine of the eastbound train obscured the view to the east after the engine passed the crossing. This freight train contained 30 cars and was about 900 feet long. After the last car had passed the crossing about two or three rail lengths, the plaintiff started his horse and drove upon the crossing. Just before he started his horse, he looked east and west and listened, but could see but a short distance east on account of the smoke. When he started his horse the smoke was clearing away and he could see about 100 feet to the east. As his horse stepped upon the track the plaintiff, who was still looking to the east, saw an engine and train of cars about 100 feet away approaching him from the east on the south track at the rate of from ten to fifteen miles per hour. He whipped the horse with the lines and endeavored to pass in front of the engine, but the rear wheel of the wagon was struck and plaintiff was injured. The whistle on the engine was not sounded, nor was the bell rung. From the point where plaintiff had stopped his horse he could see, except for the smoke, a distance of about a half mile eastward along the south track. There were no intervening obstacles, other than the smoke.

From these facts, to which the plaintiff alone had testified, the court below concluded there was no right of action shown, the plaintiff being guilty of contributory negligence. This view was shared by the Supreme Court and the judgment affirmed.

The court reiterated the general rule so often before declared as to what constitutes "ordinary care under all the circumstances," on the part of a traveler who undertakes to pass over a crossing at grade. He must look and listen for signals and approaching trains, and use all his faculties to avoid danger. The greater the danger the more vigilance he is required to use. If by listening or looking he could have avoided the danger, and failed to do so, he was at fault and cannot recover. If he did look and listen, and did not heed what he saw or heard, he was guilty of negligence. The court then proceed to demonstrate that the plaintiff and appellant in that case did not make proper use of his faculties, or rather that he did not properly heed that which he had perceived by the use of them. In this connection we quote from the learned judge's opinion:

"It is clear from the appellant's testimony, that when he came to a stop forty feet south of the south main track the east bound train was about opposite the depot, which was two hundred and fifty feet west of the crossing. This train was about nine hundred feet long, and going east on north main track, at about the rate of fifteen miles per hour. When the caboose of the east bound train had passed two or three rail lengths east of the crossing, appellant saw the engine of the west bound train [the train by which he was struck] one hundred feet east of the crossing. This train was going at about the rate of fourteen or fifteen miles per hour, about the same rate per hour as the east bound train. It is clear that from the time the east bound train was two hundred and fifty feet west of the crossing until it reached the crossing the west bound train on the south main track was within one-half mile of the crossing and in plain view thereof. During all this time, and until the engine draw-

ing the east bound train passed onto the crossing, there was no smoke to obscure appellant's view east on the south main track, *and if he had looked in that direction* any time between the time he stopped forty feet south of the track and the time the engine of the east bound train passed onto the crossing, *he would have seen the train on the south main track approaching from the east. He had an unobstructed view to the east, and he either did not look in that direction, or if he looked did not heed what he saw.* It would be no excuse that immediately afterward the smoke obscured his view of the approaching train, so that he could not see its approach. *He knew it was approaching and went upon the track at his peril. Such conduct, under the authorities cited, is negligence per se.*"

There is here not a word said, it will be observed, as to the duty of the injured person to wait until the train going east had passed a sufficient distance to enable him to see whether another train was then approaching from the east. The plaintiff and appellant in that case was held guilty of contributory negligence, not because he failed to wait until the obstruction of his view, caused by the east bound train was removed, but because he entered upon the track after he could have seen, and in fact had seen the train approaching from the east at a rate of speed of from ten to fifteen miles per hour, and by endeavoring to pass in front of the engine knowingly exposed himself to the danger of the collision which followed. We have italicized that portion of the quotation we made from the case relied upon as declaring the law differently from the way we stated it in our original opinion in this case, which we think clearly shows the ground upon which the Supreme Court base their opinion, and it does seem to us that the merest tyro in

the law will be able to distinguish the two cases at a glance. In the case before us for final determination it is not claimed that the appellee could have seen, and did see the train that struck him approaching the crossing for a distance of one-half mile, 100 feet, or any distance whatever, or that he could have seen it, had he looked and listened. The only claim here made is that if he had waited until the west bound train had passed a sufficient distance, he might have seen the train by which he was run down advancing toward the crossing. How the ruling of the Supreme Court in the case from which we have quoted can be said to be in conflict with our holding on the question of contributory negligence is therefore not easy for us to perceive.

In the case referred to, the court proceed to say that even if the smoke from the east going engine had obstructed the view east of the crossing for some distance, he knew that this was but a momentary obstruction, which the wind would presently clear away, and that he would then be enabled to have a clear view east on the south track for one-half mile. He knew that a train could and did run west on the south track, while trains were going east on the other. The railroad company had done nothing to mislead him or throw him off his guard. Under these circumstances the court declare that it was his duty to wait until he could see and hear and ascertain with reasonable certainty that it was safe to cross.

It will be observed that these facts are only assumed and the rule applied which would govern if they had been true. The actual facts showed, as we have said, that the plaintiff could have seen the train approaching half a mile away, and did see it when he entered upon the track, 100 feet distant. But even the supposed facts do not coincide with those in the

present case.  Here, as has been shown, trains and engines were constantly passing, and instead of a double track we have a large number of them.  The crossing was upon one of the principal streets of a populous city, at grade, where pedestrians had a right to cross and recross and must do so in order to use the street.  We do not say that under such circumstances the traveler over the tracks was not bound to use the highest degree of vigilance consistent with the surroundings.  But while this was the duty of appellee, a like degree of care devolved upon the appellant, and the appellee had a right to assume that this was being done.  He could not be required to wait for an indefinite length of time and see that no train or engine was approaching from either side before he could legitimately undertake to cross.  The crossing was a public highway and pedestrians had a right to its use, as well as the railroad company.  We do not declare as a matter of law that the appellee was or was not guilty of negligence under the facts, for we have not all the facts before us.  What we do hold is that it was a question for the jury to determine from the evidence as to whether the appellee exercised such care as the law required at his hands.  In the case relied upon the evidence was in the record, and the court could well determine from it whether the plaintiff was or was not at fault.  In the case at bar, the evidence is not in the record, and we would not be permitted to look to it if it were, and the answers to interrogatories are not antagonistic to the presumption of due care which the general verdict carries with it.  Granting that some of the facts proved and assumed in the Oleson case were like some of the facts in the case at bar, it does not follow that the latter must turn upon the same facts upon which the Oleson case turned.  Because, in the Oleson case there was a volume of

smoke made by the passing train which rendered it dangerous for the plaintiff to pass before it had cleared away, we are not required to hold that in the present case the appellee was also bound to wait till the smoke had disappeared. Otherwise the appellee might be required to wait forever before attempting to enter upon the highway at this crossing. There is no law that requires him to do this.

Appellant's learned counsel also find fault with our construction of the case of *Mayo* v. *Boston & Maine Railroad,* 104 Mass. 137. Counsel say that this case was not one involving the rights and duties of a traveler upon a highway at a railroad crossing at all, and in support of this assertion state that the plaintiff had been a passenger of the defendant railroad company, "and had been discharged from its train at a point substantially upon a highway or street." Our only purpose in citing this case, as may be plainly seen from the reading of our former opinion, was to show that it is not conclusive proof of negligence on the part of the plaintiff that he passed over the crossing at a time when his view of the track was obstructed by a passing train. Notwithstanding the fact that in the case cited the plaintiff was or had been a passenger on the defendant's railroad, when she undertook to cross the track at the highway crossing, she was bound to exercise that "due and ordinary care" which pedestrians are required to exercise when about to pass over such a crossing. The fact that one has been a passenger, and is still entitled to the protection as such, while in the act of leaving a train and a railway station, does not absolve him from the duty of exercising proper care at a crossing over which he is required to pass in his route from the train, nor is the opinion based upon any theory to the contrary.

In the case cited the court did not undertake to de-

fine the exact degree of care that must be used by the discharged passenger, as distinguished from that to be exercised by other pedestrians. The court in that case simply ruled that it was a question for the jury to decide, whether due care had been exercised. "If she went upon the track," says the opinion of the court, "where another train was to be expected at any time, when she was unable to see whether it was approaching or not, or without looking to see if the way was clear of danger, she did not use that reasonable precaution which every one is bound to exercise for his own protection in such places. We are unable to see how the accident could have happened without some want of proper care on her part. The inference from the result is very strong. But its force is applicable only in disproof of whatever testimony there may be tending to show the exercise of care. *It presents only the question of preponderance; and however decided that preponderance, it does not transfer the determination of the issue from the jury to the court.*" (The italics are our own.) This supports our holding fully. Indeed, the case at bar is a stronger case for the appellee than the case cited, for in the Massachusetts case the facts were all before the court, while here the evidence is absent. Neither case, however, is one in which the court is permitted to say as matter of law that the conduct of the plaintiff showed contributory negligence. To use another quotation from the opinion in the Mayo case: "We do not perceive, therefore, in the mere fact that she started to cross the railroad track so soon after the train by which she came had left the station, such clear and inexcusable want of care as to justify the court in withdrawing the case from the jury." This is precisely our view as to the case at bar. We cannot say, in the absence of the evidence, whether the appellee was or

was not chargeable with contributory negligence in starting over the track so soon after the west bound train had passed the point opposite that where appellee stood. It was a question for the jury, and, although there are findings indicating carelessness on his part, they are not so clear and conclusive as to overcome the presumptions in favor of the general verdict. Nor do we think a different rule is announced in *Fletcher* v. *Pittsburg, etc., R. R. Co.,* 149 Mass. 127. The ruling in the case just cited in no wise conflicts with that in the Mayo case. The Fletcher case was reversed upon the evidence. There a driver of a four horse team undertook to drive across a railroad track at a grade crossing immediately after a freight train had passed. He knew there was no gate or flagman there and that a passenger train was due at about that time each day, and was familiar with the crossing. Under these circumstances he was held guilty of contributory negligence. The facts in the Fletcher case were similar to those in *Marty* v. *Chicago, etc., R. W. Co.,* 38 Minn. 108, which the appellant's counsel think is also in conflict with our holding. A very cursory examination will serve to disclose the difference in these cases.

Other cases cited by us, it is insisted by counsel for appellant, do not support the views we expressed in the former opinion. We have again examined those cases, and are still of opinion that they bear the construction we have placed upon them. Nothing has been said in the very elaborate brief of appellant's counsel which leads us to any different conclusion than the one at which we arrived in our original opinion.

Petition overruled.