## Peirce, Receiver, v. Jones.

[No. 2,728.    Filed April 5, 1899.]

RAILROADS.—*Injury at Crossing.*—*Contributory Negligence.*—*When Question for Jury.*—Plaintiff traveling along the street in a funeral procession was thrown from the seat of the carriage in which she was riding by a sudden movement of the carriage, caused by an approaching train, and was injured. There was a space of about 100 feet where the track could be seen in the direction of the approaching train, but upon reaching a point within 100 feet of the track the view thereof was cut off by box cars and other obstructions. As the procession approached the crossing the funeral director descended from the hearse and walked ahead of the hearse across the track, and the flagman beckoned for the procession to move forward. Plaintiff and her husband both looked toward the track, but did not "see or hear anything" until so near the track that they could not turn back on account of the carriages following. *Held*, that the question as to plaintiff's contributory negligence was for the determination of the jury. *pp. 164-172.*

APPEAL AND ERROR.—*Examination of Witness.*—*Objection.*—Only such objections to questions asked in the examination of a witness as were presented to the trial court can be urged on appeal. *pp. 172, 173.*

EVIDENCE.—*Declarations as to Suffering.*—*Personal Injuries.*—Plaintiff in an action for damages on account of personal injuries may show in evidence declarations made as to existing pain and suffering. *pp. 172-174.*

From the Tipton Circuit Court. *Affirmed.*

*C. A. Schmettau, A. B. Clark* and *Clarence Brown,* for appellant.

*B. F. Harness* and *Gifford & Coleman,* for appellee.

BLACK, C. J.—The appellee, Anna E. Jones, brought her action against the appellant as receiver of the Toledo, St. Louis and Kansas City Railroad Company, for damages for a personal injury suffered in passing over the track of the railroad at a street crossing in the city of Kokomo, through the negligence of the servants of the defendant. There was a general verdict for the appellee, her damages being assessed at $1,000.

It is urged on behalf of the appellant that the evidence failed to show sufficiently that the appellee was free from contributory negligence. The casualty occurred between 10 and 11 o'clock in the forenoon, on the 11th of July, 1895, the weather being clear. The course of the railroad was east and west, and a freight train approached from the east. The appellee was riding in a two-seated carriage southward on Smith street, which crossed the railroad at right angles. The carriage was drawn by one horse, driven by the appellee's husband, who was seated on the right side of the front seat. The appellee was seated on the left side of the same seat, with a child seated between her and her husband. The other seat was occupied by two other ladies and another child. The carriage was one of a number in a funeral procession, the hearse containing the corpse being at the front of the procession, and the carriage in which the appellee was seated being the second carriage from the hearse. On the east side of Smith street and near it, and also near the railroad track, were some obstructions consisting of a small house and a shed for stone cutting and certain stock pens, with some chutes for loading animals, and also a number of box freight cars from twelve to fourteen feet high on two side-tracks on the north side of the main track on which the train in ques-

tion approached.   The center of the main track was thirteen feet south from the center of the first side-track, which extended across Smith street, and the center of the main track was thirty-seven feet south from the center of the second side-track, at the east side of Smith street, to which it extended, but it did not cross the street.   There was a depot on the north side of the main track about 540 feet east of Smith street.   One of these side-tracks branched off from the other, and there were a number of box cars on each of the side-tracks.   These cars extended from the sidewalk on the east side of Smith street about 400 feet eastward toward the depot.   From the north side of the building for stone cutting, which was about seventy-nine feet north of the center of the main track, the view was obstructed by structures and cars. There was a space of about 100 feet where a traveler passing southward on Smith street toward the crossing could look through and see the main track of the railroad from the west side of the depot to the box cars on the side-tracks.   When he reached a point about 100 feet from the main track, he would lose sight of the clear space west of the depot.   There was evidence tending to show that he could not see the track east of the depot before arriving at the crossing.   The appellee had been living in the city of Kokomo for about sixteen years.   For a number of years the railroad company had kept a flagman at this crossing, and a flagman, a servant of the appellant, who had served in that capacity for a year or two at this place, was stationed there at the time of the occurrence in question.   Before the train approached and crossed the street, no whistle or alarm was sounded until the engine was very near, or "right at," the crossing, when the whistle was sounded, the evidence being conflicting as to the number of blasts.   As the procession approached the crossing, the funeral director descended from the hearse, about fifty or sixty feet from the railroad, and walked forward ahead of the hearse toward the crossing, the hearse following.   The horses drawing the vehicles went forward at a

walk.  The funeral director saw the flagman, whom he knew, at the crossing.  The flagman beckoned for the procession to move forward.  He said the freight train would stop for water.  The place for water was on the south side of the railroad, east of the depot and at Washington street, which was two squares east of Smith street.  The flagman had a light flag, which he dropped, and he took up a red one.  The hearse passed on across the track.  The funeral director saw the train approaching as he passed over the track.  He first saw it when he got upon the track, the hearse being back of him and about fifteen feet from the track.  The train was then between the water tank and a railroad crossing east of Washington street.  The engineer on this train testified that he saw some teams crossing at Smith street from the time he left the depot at Washington street.  The funeral director had gone about 120 feet from the railroad track when the engine reached the crossing of Smith street.  The second vehicle of the procession followed close upon the hearse, and also passed over, and the vehicle in which appellee was seated followed, the distance between the horse drawing it and the vehicle in front of it being about five feet, according to some part of the testimony, and from ten to twelve feet according to other testimony, the horse approaching the crossing in a walk.  The funeral director saw the flagman make signals to those behind in the procession.  When the vehicle in which the appellee was riding had reached the point about 200 feet from the crossing, where the main track for a space west of the depot could be seen, there being here nothing to obstruct the view so as to prevent one from seeing a train if it were passing directly west of the depot, the appellee's husband looked toward the railroad, but did not "see or hear anything."  He looked across at the railroad all the way down from this point.  When he first discovered the train coming, the horse was on the main track and the train was very near, about twenty feet off.  He could not turn back because of the carriages following.  The whistling of the engine and the escap-

ing steam frightened the horse. He struck the horse with the whip, and the horse shied and lunged to the right and carried the carriage over, so that the engine passed immediately behind it, barely missing it. By the sudden movement, the appellee was thrown over the side of the carriage upon the lamp, and against an upright iron bar of the carriage, and thus received the injury for which the action was brought. The appellee's husband saw the flagman at the crossing. He was standing on the main track at the east side of the crossing. He motioned down the cars, and then motioned for appellee's carriage to go on southward across the track. The box cars, which were on the side-tracks, extended to a point about twelve feet from the portion of the street over which the procession was passing. The flagman was first seen by the appellee's husband as he drove down a descent of about two feet from the grade of the street to that of the railroad, and when the appellee's carriage was about twenty feet from the main track, or about even with the more northern switch. The appellee's husband could not see up the track for a space of some seventy-five to 100 feet before reaching the crossing, and as soon as he reached a point where he could look up the track he did so. The appellee, as she approached the crossing, looked for a train, but did not see any. She watched all along as they went down the road. She first saw a train when she was on, or nearly on, the track. She paid attention after she got down behind the box cars. This was about 100 feet from the railroad track. She first saw the flagman when she got down to the crossing. He was "up a little way," so that the box cars hid him until she got down to the track, and he kept motioning for her carriage to go on over south. She saw him doing so. He stood there on the tracks between the appellee's carriage and the train, until he had to jump off out of the way of the train. The vehicle next behind that in which the appellee rode was so near the main track when the train passed, that the driver turned the horse's head to a fence to avoid the

train. An occupant of this carriage saw the flagman when this vehicle got down to the track, and before she saw the train. He was making motions with his flag to the occupants of this carriage to go on ahead. When the persons in this carriage first saw the train, the front part of appellee's carriage was on the track. The flagman was flagging the train to stop, and also motioning for the procession to go on.

There was much evidence tending to show that in passing over a railroad crossing about 2,100 feet east of Smith street, the train had slowed up (as the engineer stated, to the rate of between five and six miles an hour) to let one of the employes get off the train and adjust a target and get back on the train. The evidence showed that there was a down grade toward the Smith street crossing from a point some distance eastward. The train did not stop before passing Smith street. The evidence as to the rate of speed of the train at the Smith street crossing varied greatly, some evidence indicating a speed of fifteen to twenty miles an hour. It is contended that the evidence did not show that the appellee listened for a train as she approached the crossing, and a large number of cases are cited, and many quotations therefrom are set out, in appellant's brief, for the purpose of illustrating the rule of law relating to looking and listening when about to cross a railway. To show herself not chargeable with contributory negligence, it was necessary for the appellee to establish to the satisfaction of the jury that there was no want of ordinary care, under the circumstances, by way of act or omission on her part, which, by its coöperation with the defendant's negligence, proximately caused her injury. Concrete rules of law declaring particular acts or omissions to be contributory negligence are subject to this general proposition, and are intended to be applied for the solution of the general question in the particular case. It is sufficient if it appear that the plaintiff observed and exercised the care and diligence which was reasonably to be expected of an ordinarily prudent person under the particular circum-

stances. While it is true that one in a situation in which he can exercise precaution for himself cannot, by relying upon the diligence of others, relieve himself from the consequence of his failure to exercise such precaution, yet the conduct of others within the observation of the plaintiff, evincing caution on their part, and creating an appearance of safety such as ordinarily prudent persons are accustomed to act upon in the affairs of life, may sometimes constitute an ingredient in the solution of the question of contributory negligence. Anything which the common sense of mankind will admit as indicative of ordinary care may be worthy the consideration of the jury trying the question. There may be circumstances where it reasonably appears to a person that his safety does not depend wholly upon his own watchfulness; and when he may rely with reason upon appearances, he is not negligent for so doing, or at least it is a question for the jury. See *Wheelock* v. *Boston, etc., R. Co.,* 105 Mass. 203; *Spencer* v. *Illinois, etc., R. Co.,* 29 Iowa 55.

In the case before us, a passing train could have been seen for a space west of the depot from a point about 200 feet north of the crossing to a point about 100 feet north of the crossing. That there was no train there to be seen was shown by the evidence, as we have recited it. That the appellee was not wholly devoid of care or diligence was indicated by her watching for a train while passing over this space. When and after she arrived at a point about 100 feet north of the crossing, from which point to the crossing a train could not be seen, and looking would be of no avail, that is, after she got down behind the box cars, she "paid attention." She could not then attend with her eyes or otherwise than by listening, and by observing the conduct of others. When the funeral director, looking up the track, saw the train, it was still east of the depot and was running comparatively slowly. When the funeral director had gone forward for the manifest purpose of such an act, in the presence of the occupants of the vehicles in the procession, it was not

needed, in order to constitute ordinary care, that the appellee or other members of the party should also descend to the ground and go forward for the same purpose. The flagman, by his statement to the funeral director and by his signals, invited the whole procession to pass at once over the railway, and, in obedience to this invitation, the whole procession did move forward at a walk. These circumstances were indicative of safety to one who had no knowledge of the actual approach of a train. Men and women of ordinary judgment and prudence are constantly so acting from such indications in every day life. When the appellee was still at a sufficient distance to avoid danger by halting on the north side of the crossing, she and her husband, who was driving the carriage, saw the flagman, who, in the performance of his service as such for the appellant, directed the appellee and those with her to proceed across the track, assuring them by his conduct within the scope of his employment that it was safe and proper for them to proceed, and that the appellant acting through him desired them to do so. The obstructions at this crossing made it proper to keep a flagman there, and he represented the appellant to warn travelers on the street of danger from trains, or to assure them that the track might be crossed with safety. It was compliance with the request and direction of the flagman, and therefore of the appellant, and not any negligent failure of the appellee to look or listen or stop, which was the proximate cause which concurring with the other conduct of the appellant's servants caused her injury. It cannot be said as a matter of law that it was not reasonable, under the circumstances, for the appellee to go forward as so invited. If it may be said that it might have been found that there were indications that there was a train to the eastward to which the flagman was giving signals to stop, still he also by the same method invited the appellee to cross, and it was a proper matter for the jury to determine whether to do so was, under all the circumstances, consistent with ordinary prudence. There was no apparent or discoverable

Peirce, Rec., *v.* Jones.

danger so imminently threatening that a person would be required as a matter of law to disobey the flagman's signals. We cannot say, as a matter of law, that she was bound to try to prevent her husband from obeying the flagman or to get out of the carriage, or that her conduct at any stage was not what the jury found it to be, consistent with reasonable care.

There was here no mere reliance on negative indications of safety produced by negligent conduct of the appellant's servants calculated to mislead, but there was an affimative assurance of safety given by the appellant with intent to create confidence and induce action, and which did produce the confidence and procure the action intended, there being no manifest reason to persuade or warn to the contrary course.

If, in view of such a positive invitation, it may not be said, indeed, that, as a matter of law, the appellee was justified in assuming that there was no train approaching so near and with such speed as to be dangerous, and in acting upon such belief, at least it may be said that the jury might properly find that there was no contributory negligence. It cannot be said properly that a failure to use her natural senses with ordinary diligence so certainly contributed proximately to the appellee's injury that it was not within the province of the jury to find her to be without fault. Even where a traveler only found the gate open and received no warning from the flagman, it was held that the traveler might act on such assurance of safety without being chargeable with negligence. *Pennsylvania Co.* v. *Stegemeier*, 118 Ind. 305, 310. See, also, *Chicago, etc., R. Co.* v. *Boggs*, 101 Ind. 522; *Terre Haute, etc., R. Co.* v. *Brunker*, 128 Ind. 542; *Cleveland, etc., R. Co.* v. *Harrington*, 131 Ind. 426; *Cleveland, etc., R. Co.* v. *Keely*, 138 Ind. 600; *Pittsburgh, etc., R. Co.* v. *Burton*, 139 Ind. 357; *Chicago, etc., R. Co.* v. *Hedges*, 105 Ind. 398, and cases cited; Beach Cont. Neg. (3rd ed.) sections 67, 68, 190, and notes.

In *Chicago, etc., R. Co.* v. *Hedges*, 118 Ind. 5, 12, it is said, that one may be excused from looking when a flagman

or other person employed by the company, whose duty it is to look out for approaching trains, signals that it is safe to cross, and that one approaching on a public highway who uses such opportunity as the situation affords to look and listen, is not chargeable with negligénce as against a railroad company, which by its neglect to give the required signals lures him into danger.

In *Cadwallader* v. *Louisville, etc., R. Co.*, 128 Ind. 518, 521, it was said: "Had the flagman done anything to induce the appellant to attempt a crossing at the time she was hurt, or anything to throw her off her guard, then the question of her negligence would have been a question for the jury." See, also, *Callaghan* v. *Delaware, etc., R. Co.*, 5 N. Y. Supp. 285; *Kane* v. *New York, etc., R. Co.*, 9 N. Y. Supp. 879.

The case might be illustrated by numerous decisions holding the plaintiff not chargeable with contributory negligence where he obeyed the directions or proceeded in reliance upon the assurances of the defendant, or of the defendant's servants acting within the scope of their duty, upon whom the plaintiff might properly rely, where the danger was not obvious to the plaintiff; as where a passenger obeys the directions of a conductor or other trainman, or railway agent acting within the scope of his. employment upon a train, or at a railway station. See *Cincinnati, etc., R. Co.* v. *Carper*, 112 Ind. 26; *New York, etc., R. Co.* v. *Doane*, 115 Ind. 435; *Warren* v. *Fitchburg R. Co.*, 8 Allen 227.

Counsel have criticised the action of the court in relation to the instructions to the jury. Considering the instructions as a whole, we find no available error.

Some question is made as to the admission of evidence. John Osborn, a witness testifying for the appellee, was asked concerning her and on her behalf: "What complaint did you hear her make, if any, of suffering from a pain in her left side?" The appellant's objection to this question having been overruled, the witness answered: "She complained of her left side hurting her a great deal." There was no motion

Peirce, Rec., v. Jones.

to strike out the answer. It is urged in argument, as an objection to the question, that it failed to establish the time when the complaints were made "as before or after the accident." This does not correspond with the objection stated to the trial court, that "it was long after the accident." In truth, as plainly appears from preceding testimony of this witness, the time to which the question related was "just a few weeks" after the injury. It is further objected in argument that the question "failed to limit the pain to such as might be caused by the accident." Such an objection was not stated to the trial court. The evidence showed, as above indicated, that the appellee was thrown so that her left side struck the carriage lamp, and the question limited the complaint about which the inquiry was made to complaint of suffering from pain in that side.

It is an often stated rule that only such objections to questions asked in the examination of a witness as were presented to the trial court can be urged on appeal.

In *Board, etc., v. Leggett,* 115 Ind. 544, it is said: "An injured person may show in evidence declarations connected with existing suffering and expression of it, but he may not give an account of the manner in which he received his injuries, nor recount what is past."

In *Chicago, etc., R. Co. v. Spilker,* 134 Ind. 380, it is said: "It would not be proper to give in evidence a conversation with the injured party in which she related her past suffering or injury, by way of narrative, but it was proper for the witness to relate what appellee had said as to her condition, particularly of concealed or internal suffering, as it existed at the time the statement or exclamations of suffering were made." See, also, *Town of Elkhart v. Ritter,* 66 Ind. 136; *Carthage Turnpike Co. v. Andrews,* 102 Ind. 138; *Cleveland, etc., R. Co. v. Newell,* 104 Ind. 264; *Sturgeon v. Sturgeon,* 4 Ind. App. 232; *City of Alexandria v. Young,* 20 Ind. App. 672.

The question to which the appellant objected, by its form,

called for the complaint, if any, made by the appellee of then present suffering from then existing pain in her left side, and did not call for any statement concerning past pain or suffering, or the narration of a past occurrence. Without regard to the character of the objections urged here against the question, we could not find available error in the court's action. Some witnesses were permitted to testify, over appellant's objections, that the appellee had talked a great deal about her injury. These answers did not indicate what she had said, or to what particular fact or condition her talk related, or whether it tended to show how she was injured, or the effects of the injury, or her mood or manner. We are inclined to regard this evidence as not so material as to justify a reversal.

There was evidence tending to prove an injury to the appellee's left kidney caused upon the occasion in question. A question propounded to a witness as a medical expert, relating to the continuing or permanent effect of such injured condition of the kidney was objected to. The objection was such that the court would understand it as being based upon the form of the allegation of damages in the complaint,— not an objection to a proposal of evidence of the particular physical condition because it was an attempt to prove remote or speculative damages, but an objection that it was offered to prove damages not specially alleged in laying the damages in the complaint. In argument, however, the evidence is objected to on the ground of its remoteness. The trial court should have had an opportunity to pass upon the question before submitting it to us. We find no available error. Judgment affirmed.