## PEIRCE, RECEIVER, *v.* RAY.

[No. 2,905. Filed March 13, 1900.]

CONTRIBUTORY NEGLIGENCE.—*Injury at Railroad Crossing.—Complaint.*—A complaint against a railroad company for damages sustained at a crossing alleged that from a point about one-half mile east of the crossing defendant's road curved slightly to the south, and that there were a number of houses, trees and other obstructions to the view eastward along said track, extending to within twenty-one feet of the south rail of the track, obstructing the view in the direction from which the train was coming; that plaintiff looked and listened for the approach of trains as he neared the crossing from a long distance south of the same, until his horses' feet were on the track, and it was impossible to avoid the collision; that defendant failed to give the statutory signals upon approaching the crossing, and that plaintiff was without fault. *Held*, that contributory negligence was sufficiently negatived by the pleading. *pp. 302-305.*

SAME.—*Question of Fact.—Special Finding.—Railroads.—Injury at Crossing.*—In an action against a railroad company for injuries sustained at a crossing, it was shown by the evidence that there was a slight curve in the road in the direction from which the train approached; that plaintiff approached the crossing in a road wagon, and when within fifteen or twenty steps from the crossing, stopped his horses and looked and listened, but could not hear the train approaching, nor see it, as the view of the track was obstructed by buildings; that he drove on in a walk until the horses were on the track, when he saw the train approaching and attempted to start the team more rapidly and cross the track, but was prevented by a person riding with him, who took the lines and jerked the horses back, and the horses were struck and killed and plaintiff was injured. *Held*, that it could not be determined, as a matter of law, that the evidence was not sufficient to sustain a finding that plaintiff exercised ordinary care. *pp. 305-313.*

From the Howard Circuit Court. *Affirmed.*

*C. G. Guenther* and *A. B. Clark,* for appellant.

*J. C. Blacklidge, C. C. Shirley* and *Conrad Wolf,* for appellee.

BLACK, J.—The appellee brought his action against the appellant as receiver of the Toledo, St. Louis and Kansas

City Railroad Company, to recover damages for the killing of appellee's two horses, and the destruction of their harness, and injury to his wagon, and for personal injury to the appellee, caused by the collision, through appellant's negligence, of a locomotive engine with appellee's team and wagon at a public crossing on appellant's railway in the town of Greentown, in Howard county. A demurrer to the complaint for want of sufficient facts was overruled. There was an answer in denial, and upon trial by jury a verdict in favor of the appellee for $1,200 was returned. By way of objection in argument against the complaint, it is claimed that, notwithstanding its general averment of the appellee's freedom from fault, it affirmatively appears from the facts particularly stated that the appellee was chargeable with contributory negligence. It appears from the complaint that the street on which the appellee was driving (Meridian street) runs north and south across the railway, which crosses the street from east to west, "bearing, however, slightly to the south"; that "from a point about one-half mile east of said street the track of defendants railroad curves slightly to the south, and on the east side of said street there are a number of houses, trees, and other obstructions to the view eastward along said track, extending to within twenty-one feet of the south rail of said railroad, back to the distance of several hundred feet, rendering the running of defendant's trains at a high rate of speed at that point particularly hazardous, and especially so in the absence of suitable signals announcing the approach of such trains to said crossing; that on," etc., the plaintiff was driving along Meridian street from south to north, with a team of horses attached to an ordinary road wagon, and when his said team was upon said railroad track they were struck by one of the defendant's locomotives in charge of his agents and employes, and so operated by him, attached to a freight train approaching from the east, and running at a great and unreasonable speed, to wit, at the

rate of fifty miles an hour, thereby killing both of plaintiff's horses, injuring said wagon and the harness worn by said horses, tearing them from said wagon, and seriously injuring plaintiff's hands and arms, by causing the lines in plaintiff's hands to be violently jerked, etc. It was further alleged that the collision and the injuries resulting therefrom were caused wholly from negligence and carelessness of the appellant and his agents and employes in charge of and operating said train, in failing to sound the whistle of said engine or to ring the bell thereon, or to give any other signal whatever of the approach to the crossing, and so negligently running said locomotive and train at said high and unusual rate of speed across said street, etc.; that the appellee was himself wholly without fault, and that he looked and listened for the approach of trains from either direction as he neared said crossing, from a long distance south of the same, until his horses' feet were on the railroad track, and it was impossible to avoid said collision and the injuries resulting therefrom; that he also caused his team to stop just before entering said track, for the purpose of looking and listening for approaching trains, and that he did so look and listen at that point, but that none was visible or within hearing; that the person in charge of said locomotive negligently and carelessly failed to sound the engine whistle at a distance of not more than 100 and not less than eighty rods from such crossing, to signal the approach thereto, and negligently failed to ring the bell thereon or to cause it to be rung, or to give any notice whatever to persons about to use the street crossing that said locomotive and train were approaching, etc.

It is contended, in effect, that these averments show that, after the appellee had passed to a point twenty-one feet from the railroad track, he could have seen a train approaching from the eastward for a distance of nearly half a mile, and that the physical facts alleged inevitably lead to the conclusion that he did not look or listen for a train when he

passed to the track from the point twenty-one feet south of it, or that he saw the train and disregarded what he saw. The claim that the complaint shows that the appellee could have seen along the track for a distance of nearly half a mile—on which this argument is based—is not well taken. While the averments as to the course of the railroad are not as definite and clear as might be desired, they are not susceptible of the meaning so attached to them by counsel, and we cannot find reason for upholding the claim that contributory negligence is not sufficiently negatived by the pleading.

In discussing the action of the court in overruling the motion for a new trial, it is contended that the evidence disclosed that the appellee was guilty of contributory negligence.    There was evidence tending to prove, amongst other things, that the appellee resided a few miles north of Greentown, and for many years had lived at the same place, and had often crossed at the place where the collision occurred, and he knew it was a dangerous crossing.    On the day of the injury in question he had been with his team and wagon at a grist-mill situated immediately adjoining the south side of the railroad, eastward from Meridian street. Soon after 6 o'clock in the evening he started for his home from the mill, and drove thence to Meridian street, at a point about 300 feet south of the railroad crossing; and there three other men, who wished to ride homeward with him, got upon the wagon, and he drove northward on Meridian street toward the crossing,—one of said three men, Watson Roe, sitting in front with the appellee and at his left side, the other two, Harrison Carter and Noah Loop, standing further back in the wagon.    The street ran north and south, and the railroad crossed it at or near right angles, in the northern part of the town.    The street was eighty feet wide, and sloped upward to the railroad track, which was about four feet higher than the street south of the

slope.  Along the east side of the street south of the cross-
ing were obstructions (described in the evidence) which cut
off the view toward the east.  When appellee had driven
to a point about fifteen· or twenty steps south of the railway,
as testified by the appellee, he stopped the team for the
purpose of giving the two standing men an opportunity to
make seats for themselves of some sacks, which they did,
under appellee's direction.  On the east side of the street
was a building called a picture or photograph gallery, which
extended northward to a point five steps from the cross-
ties, or about fifteen, seventeen, eighteen, or twenty feet,·
as variously estimated by witnesses, from the railway track.
While the seats were being prepared, appellee looked and
listened, but did not see or hear a train.  At this point and
thence northward until the picture gallery was passed, the
view eastward was obstructed so that a train could not be
seen in that direction.  After the seats were arranged, and
the two men in the rear were seated, about three feet be-
hind the appellee and said Roe, the appellee drove on
toward the crossing in a slow walk.  The weather was
threatening rain, and a strong wind—"a pretty good gale" ·
—was blowing from the west, and soon after the collision
it did rain.  There was evidence from which the jury
might have found that no signals were given from the en-
gine which caused the injury as it approached from the
east, except the sounding of the whistle immediately before
and almost simultaneously with the collision, though the
evidence in this regard was conflicting.  The train in ques-
tion was a light freight train, which did not stop at this
station, and, while the evidence as to its speed was quite con-
flicting, there was evidence that it was running at the rate
of thirty-five or forty miles an hour.

The appellee testified:  "I started up, and when I got
my horses on the iron [on the road] I stooped forward this
way [illustrating], to see past Watts Roe,—to see up past
the depot," which was toward the west.  "At that time,

some one behind me hallooed, 'There is the train.' At that time I raised my lines to get off of there. Mr. Roe grabbed my lines and jerked my horses back. My wagon was just back enough that it cut the horses loose from the wagon, and whirled the wagon around out of the way." Being asked how near the train was to him when the whistle blew, he answered: "It must have been right on me. Just as somebody hallooed, 'There is the train,' Mr. Roe grabbed my lines and jerked the horses back, was the first warning or whistle blowed, and I was struck at the same time." Being asked for what distance east the track could be seen, he testified, "You can't see it at all, unless you get past the photograph gallery." Q. "How far past the photograph gallery do you have to go before you could see the train on the curve to the south? How far can you see?" A. "You would have to be clear past the photograph gallery." He also testified that when one had passed the photograph gallery the team of horses would be on the track,—near or very close to the track; that after one got past the corner of the photograph gallery, if he were looking east at that time, he could see between fifty and sixty feet,—maybe farther; that after one got past he could see clear up to the mill, probably forty rods,—maybe more; that there was nothing to obstruct the view after passing the photograph gallery; that there was then a clear view, looking to the east. His eyesight and his hearing were good. Being asked, on cross-examination, what he did after he passed the photograph gallery, to ascertain if a train was coming, he answered: "I looked west, to see around Watts Roe. He was sitting on my left side. I only could see to the depot. I could not see, and I reached back of his shoulders. I could not see, and I reached forward and saw past Watts. At that instant, Noah Loop hallooed, 'There is the train.' I throwed my lines up this way [illustrating], Mr. Roe grabbed my lines and jerked the horses back on the track. The horses were nearly over." Q. "Why did you throw

your lines up?" A. "I was going on over." He also tes-
tified that he had then seen the train, and that he thought
it was the safest way to go over; that he thought he
could get over quicker than he could get back; that the
fore feet of the horses were then across the second rail of
the iron, and their hind feet were about between the rails,
and the front wheels of the wagon were about to rise upon
the iron. He testified that he was doing all he could "to see
and look"; that after his horses were past the corner of the
photograph gallery, if he had looked east, it might have
been that he could have seen the train before the horses
stepped on the track; that, if he had stopped as soon as it
was possible to see the train, his horses' heads would have
been on the rail, or even with the rail, but the horses would
not have been on the track. He did not at the time realize,
so well as at the trial, the fact that it was impossible to see
the train until after he had passed the corner of the photo-
graph gallery.

Watson Roe, who sat beside the appellee, testified: "We
went up pretty close to the railroad. I looked west, then
I looked east. I did not see anything when I looked east.
I could not see very far, of course." He described the ob-
structions to the view on the east side of the street. He
said: "I looked to the east. I could not see through there
very well, I had to wait until I got a little closer to the
railroad; then I looked as quick as I got past the corner of
the building, so I could see the same. I saw the train com-
ing. I said, 'Good gracious, there's the train.' It scared
me. It was coming fast, and close to us. Right at that
time Mr. Ray raised the lines up, to give his horses a slap.
I grabbed his hands, and grabbed the lines, and jerked the
team back a little. They had their front feet on the track,
pretty well toward the center of the track, by this time.
I jerked them back, I reckon about a step, and it struck
them." In his opinion, it was about eighteen or twenty
feet from the south rail to the north line of the photograph

gallery.   On cross-examination, he said that when he got pretty close to the railroad, he saw he was coming to the railroad.   "Then I looked, like I usually do.   Not being posted about train times in the country, I usually looked." He further said that when he first looked west they were not yet even with the photograph gallery, about ten or fifteen steps south; that just as they passed the corner, so he could see, he looked east; that then, as quick as he could see the road when he passed, he could see down the track fairly well; that he just turned his head to look.   Being asked how far he could see when he got past the corner of the photograph gallery and had a clear view down the track eastward, he answered:   "Your eyes will cross where the railroad curves.   There your sight crosses the railroad about a hundred feet."   Q.   "That is when you first get a sight," A.   "Yes, sir."   Q.   "After you are entirely past the corner of the building?"   A.   "Yes; but the team would be coming up on the railroad; there you can see up to the mill; then you are in danger already."   He further testified that when he made the exclamation about the approach of the train the horses' heads lacked about four feet of being up to the first iron, and they were going in a slow walk; that, if he had not grabbed the lines, they would have been about the center of the track, the hind wheels would have been over the first iron, or some place there,—"I don't know where we would have been."

Harrison Carter, who got upon the wagon as above stated, testified that he was at about the center of the wagon; that as they approached the railroad track he looked west because he could see down the railroad by looking west; that Mr. Loop was the first man to yell; that he hallooed,   "There's the cars.   Look out."   That Mr. Roe about that time saw the cars, and caught the lines and jerked the team back; that he said "Good gracious! there's the cars," and as soon as he said that he jerked the team back,—and about the same time the engine struck them.   This witness was seated

on the east side of the wagon, and Mr. Loop was sitting on the west side, about three feet behind the appellee and Mr. Roe. As this witness was looking west, he had heard Mr. Loop exclaim about the train.

Noah Loop testified that the horses were going in a walk; that when they got so he could see around the building, he hallooed, "Look out!" that, as he hallooed thus, Mr. Roe grabbed the lines; that Mr. Ray "kind of raised" the lines, and Mr. Roe grabbed them just as the witness hallooed. "It was all done in about the same time,—all in an instant." Q. "When you saw the engine first, and Mr. Roe did this, where were the heads of the horses?" A. "Right just on the track,—on the first iron." He testified that after getting past the photograph gallery one can see a quarter of a mile east; that east of the crossing there is a slight curve in the track; that it curves to the south, and then to the north; that about the mill it curves to the north; that, if Mr. Ray had been looking eastward, it would have been possible for him to have seen the train approaching before the witness could have seen it,—"a little bit, it looked like"; that when the witness discovered the train, the horses' fore feet were almost on the track. He testified that the engine, when he first discovered it, was about eighteen steps from the crossing. On cross-examination, counsel elicited from the witness his opinion that it would not be possible for the engineer to see the wagon approaching until it had gone beyond the photograph gallery, and, that about as soon as the engineer discovered the approach of the wagon, he sounded the whistle.

There is little need for discussion of the legal principles applicable to such a case, so often have they been set forth in the decisions and text-books. When the appellee first discovered the train, he was already in a position of great peril, and his conduct, influenced by the sudden discovery of his danger, in endeavoring to escape, was not in itself necessarily contributory negligence. If, without his fault,

he was placed in such danger by the negligence of the appellant, and he then, without time for deliberation, was intending and proceeding to try to pass over the railway, which apparently would have endangered his life, and was prevented by the act of his fellow traveler, his purpose and conduct so induced would not be subject to strict scrutiny for the purpose of holding him to the exercise of what would be ordinary care under ordinary conditions, when there would be time and opportunity for judicious determination and safe action. Certainly we cannot decide that there was not sufficient evidence to uphold the decision of the jury, if it can be determined that there was evidence upon which the jury might conclude, within their province, that the appellee exercised ordinary care in driving to the place where he first became aware of the approach of the train. Not only was there conflict in the evidence as to the conduct of the appellant, but also there was such want of accord in the testimony as to make the settling of facts pertaining to the conduct of the appellee in some regards a proper matter for the jury.

It was the duty of the appellee, driving the team, to take such precautions as were available to him to avoid the danger. In *Chicago, etc., R. Co.* v. *Thomas* (Ind. Sup.), 55 N. E. 861, a case having resemblances to the one at bar, the court held, in effect, that, where looking and listening would be ineffectual, neither is required; that, if looking and listening before driving upon the track would not have assisted in discovering the approach of the train in time to avoid the injury, it could not be said, as a matter of law, that failure to do so was negligence; and that, when the conditions are such as to make the question of effective seeing and hearing doubtful, the question is one for the jury.

All the occupants of the wagon were bound, each for himself, as against the appellant, to exercise ordinary care to avoid injury. The mere fact that one not having control was reasonably careful would not avail the owner and

driver, himself being negligent; yet it, with all the other facts in the case, might tend to prove that the injury was not occasioned by lack of ordinary care on the part of any of the occupants of the wagon.

In *Chicago, etc., R. Co.* v. *Thomas* (Ind. Sup.), 55 N. E. 861, 866, where the plaintiff's intestate was killed in crossing the defendant's railway from south to north, it was remarked that an investigation made by another person driving from the north under the probable observation of the deceased, with other facts specified, created a situation in which the conduct of the deceased was entitled to the judgment of a jury.

Where a person in a funeral procession was about to cross a railway, and the funeral director went in advance to look for trains, in the presence of the occupants of the vehicles in the procession, it was said to be unnecessary, in order to constitute ordinary care, for a person in one of the vehicles also to descend to the ground and go forward for the same purpose. *Peirce, Rec.*, v. *Jones*, 22 Ind. App. 163, 169.

It may be true that the fact that other persons in the vehicle with the appellee looked, and failed to see the train until the travelers were in a place of danger, does not conclusively prove that the appellee, if he had looked eastward, would have failed to see it before the point of danger was reached; yet, if such other persons while approaching the crossing were looking eastward for a train, their failure to see the coming train until it reached a certain point, taken in connection with all the conditions shown in the evidence, might be considered in determining whether or not any person situated as was the appellee, and exercising ordinary care, could have seen the train sooner than the appellee was made aware of its approach. The fact that the man who sat beside the appellee looked and could not see the train would seem to furnish some evidence that the appellee could not have seen it if he had looked eastward, if it be true that the opportunity of the man who sat beside the appellee for

making such observation was as good as that of the appellee. See *Wiwirowski* v. *Lake Shore, etc., R. Co.,* 124 N. Y. 420, 26 N. E. 1023.

If all the persons in the vehicle looked out for trains,—tne plaintiff and one other looking to the west and two others looking to the east,—the mere fact that the plaintiff did not look toward the east would not of itself be negligence *per se* on his part. It might be negligence, but not only would the determination of the true circumstances from the evidence be for the jury, but, also, it would be theirs to draw the inferences of the presence or absence of ordinary care from the facts. *Baltimore, etc., R. Co.* v. *Walborn,* 127 Ind. 142; *Cleveland, etc., R. Co.* v. *Harrington,* 131 Ind. 426; *Grand Rapids, etc., R. Co.* v. *Cox,* 8 Ind. App. 29; *Louisville, etc., R. Co.* v. *Williams,* 20 Ind. App. 576. We think it can not be determined, as matter of law, that the evidence was not sufficient to sustain a finding that the appellee exercised ordinary care. It was a matter for the decision of the jury, and we can not disturb the verdict.

Some complaint is made as to the amount of the damages awarded. The damages were measurable in part by the value of the property destroyed or injured; the remainder, which it is claimed is excessive, being the amount awarded for physical injury. There was such evidence that under the well settled rules, often declared, we can not interfere with the result reached in the trial court. Judgment affirmed. Henley, J., absent.