## SMITH, ADMINISTRATOR, *v.* MICHIGAN CENTRAL RAILROAD COMPANY.

[No. 5,079. Filed March 31, 1905.]

1. TRIAL.—*General Verdict.*—*When Answers to Interrogatories Control.*—Answers to interrogatories control the general verdict only when they are irreconcilable therewith after considering all facts provable under the issue. p. 197.

2. SAME.—*Verdict.*— *Interrogatories.* — *Uncertainty.* — *Ambiguity.*— Any uncertainty or ambiguity in the answers to the interrogatories must be resolved in favor of their consistency with the general verdict. p. 197.

3. NEGLIGENCE.—*Contributory.*—*Railroads.*—*Street Crossings.*—*Gates.* —Where the answers to the interrogatories are consistent with a conclusion that the defendant railroad company raised its gates at a street crossing and that plaintiff's decedent walked through, stopping for the passage of defendant's east-bound train, which was then on the crossing, and then proceeded a few feet until she was struck by defendant's west-bound train, such answers are not in irreconcilable conflict with a general verdict for plaintiff. p. 197.

4. SAME.— *Contributory.*— *Railroads.*— *Street Crossings.*— *Interrogatories.*—Where answers to interrogatories show that plaintiff's decedent, after defendant had raised its gates at a street crossing, attempted to cross; that an east-bound train was on the crossing; that immediately after it cleared the crossing she passed without looking east or listening for the approach of the west-bound train; that to the question whether she "could see the approaching train at any time after passing the south track" the jury answered "yes," such answers

NOVEMBER TERM, 1904.          189

Smith *v.* Michigan Cent. R. Co.—35 Ind. App. 188.

are not in irreconcilable conflict with a general verdict for plaintiff, since if the decedent could not have seen such train until it struck her or until it was too late to escape, such last answer would be true. p. 198.

5.  NEGLIGENCE.—*Contributory.—Railroads.—Street Crossings. — Failure to Look.*—The fact that a railroad track was straight and the injury occurred in the daytime is not conclusive as to plaintiff's contributory negligence in attempting to cross such track, since the passage of two passenger-trains at the crossing where the injury occurred might have been unusual, or plaintiff might have been acquainted with the schedule of trains and the west-bound was not on time.   p. 199.

6.  SAME.— *Contributory.— Railroads.— Street Crossings.— Signals.*— The ringing of a signal bell at a railroad street crossing is not conclusive as to plaintiff's contributory negligence where two trains were running in opposite directions, and where plaintiff in passing to the rear of the one was struck by the other.   p. 199.

7.  TRIAL:— *Interrogatories.— Contradiction.— Uncertainty.—Doubt.*— Contradictory answers to special interrogatories nullify each other, and answers which are uncertain, doubtful or obscure must be resolved most strongly against the party seeking judgment thereon. p. 199.

8.  RAILROADS.—*Street Crossings.—Gates.*—The opening of the gates by a railroad company at a street crossing is an 'indication of safety and an invitation to cross, and for the injury of a person so crossing, such company is liable.   p. 200.

9.  DAMAGES.—*Member of Family.*—Where two brothers, a sister and nephew lived together as members of one family, though such sister received no money for her services, still, for her death, through defendant's negligence, defendant is legally liable to such heirs, since it is not necessary in such case that decedent should be under a legal obligation to render such services.   p. 201.

From Porter Superior Court; *Harry B. Tuthill,* Judge.

Action by Charles C. Smith as administrator of the estate of Cynthia Tuley, deceased, against the Michigan Central Railroad Company.   From a judgment for defendant notwithstanding a general verdict for plaintiff·for $1,500, plaintiff appeals.   *Reversed.*

*Crumpacker & Moran,* for appellant.

*Winston, Payne & Strawn* and *Ralph M. Shaw,* for appellee.

BLACK, J.—The appellant brought his action against the appellee to recover damages for wrongfully causing the

190    APPELLATE COURT OF INDIANA,

Smith *v.* Michigan Cent. R. Co.—35 Ind. App. 188.

death of his intestate. There was an answer in denial, and a general verdict in favor of the appellant was returned with answers to interrogatories. The appellant's motion for judgment on the general verdict was overruled, and the appellee's motion for judgment in its favor upon the answers to interrogatories notwithstanding the general verdict was sustained.

In the complaint it was shown, amongst other things, that the intestate "left and leaves surviving her heirs and next of kin who are entitled to damages, and have been damaged by her death;" that the appellee owned and operated a line of railroad extending through the city of Hammond, Lake county, with a double line of main tracks and various side-tracks; that the city duly passed, adopted and published an ordinance which was in full force and effect November 27, 1900, and long prior thereto, certain sections thereof being set out, one of them declaring it to be unlawful for any railroad company to permit or cause any locomotive, engine, car or train of cars to pass along or upon any railroad within the limits of the city at a greater rate of speed than six miles per hour. By another section of the ordinance the person, company or corporation owning or operating the appellee's railroad was required to erect, maintain and operate safety-gates on either side of the tracks of the railroad where it crossed certain streets named, one being Oakley avenue, meaning thereby gates such as are commonly in use and extend across a street or avenue parallel, or nearly so, to the tracks of the railroad crossing the street, and so contrived, constructed and operated as to prevent persons or vehicles upon the near approach of any engines, car or train of cars from crossing or attempting to cross the track or tracks of the railroad where it crossed the street or avenue, until the engine, car or train of cars had passed. By another section, such persons, companies and corporations, and each of them, and the agent or employe thereof in charge of

such gates, were required to close them upon the approach of any engine, car or train of cars, and to keep them closed until the engine, car or train of cars had passed such crossing, the gates then to be opened to allow travel to be resumed on such streets, such duty to be performed between the hours of 6 o'clock a. m. and 9 o'clock p. m., during each day of each year. A fine was provided for violation of any of the provisions of the ordinance.

It was alleged that Oakley avenue was a much-traveled public highway, sixty feet wide, extending north and south through the city, both sides thereof being built up with dwellings and business places, there being sidewalks six feet in width on the sides of the street; that appellee's tracks, three in number, two main tracks and a side-track, all parallel, extending nearly east and west, crossed the avenue within the city and near the center of population thereof, in a very populous neighborhood; that hundreds of persons used the avenue every day, and crossed the railroad tracks; that appellee's right of way was 100 feet wide, and the two southerly tracks were the main tracks, and at the date above mentioned the north one of them was used entirely for west-bound traffic, all the tracks being of standard gauge, four feet eight and one-half inches wide, the south rail of the west-bound or north track being eight feet four inches from the north rail of the east-bound or south main track; that the appellee owned, maintained and operated, at the time of the occurrence hereinafter mentioned, and for many years immediately before that time, safety-gates at this crossing, so placed and constructed as to prevent travel on Oakley avenue across the railroad tracks when the gates were closed; that these gates were placed respectively at the north and south edges of the appellee's right of way, and were controlled and operated by compressed air from a shanty or watchhouse immediately west of the avenue and north of the tracks; that at the time of the injury in question the appellee employed one George Arm-

strong, whose duty it was to operate these gates in accordance with said city ordinance; that on November 27, 1900, Cynthia Tuley, appellant's intestate, who resided in a portion of the city north of the crossing, had occasion, after doing some trading, to travel on Oakley avenue north across the railroad tracks on her way to her home; that about 4:45 o'clock in the afternoon of that day she walked slowly north on the avenue, on the east sidewalk, until she came to the south safety-gates, which were closed; that one of the appellee's solid vestibuled passenger-trains, consisting of an engine and ten coaches, each sixty feet long, was passing over the south main track to the eastward; that as the last coaches of this train "were approaching and leaving" the crossing the appellee, acting through Armstrong, invited the intestate to pursue her way and to cross the railroad tracks; that, while the last coaches were so passing, the appellee, in the manner and by the means aforesaid, raised and fully opened all of these gates; that the intestate, acting on the invitation aforesaid, and the fact that the gates were opened as aforesaid for public travel, and the assurances of safety held out to her by the appellee, and the assurance given her by a careful use of her own senses, crossed the south or east-bound main track after this train had passed over it, and was near to and approaching the north or west-bound main track, when the appellee carelessly and negligently propelled and ran one of the westbound fast passenger-trains at and against her, then and thereby instantly killing her. It was alleged that the intestate knew of the provisions of said ordinance, and the custom of the appellee to obey it, as to its gates at the crossing, and relied in the manner aforesaid upon this custom; that, owing to said long, solid vestibuled train rapidly passing to the eastward between her and the train that killed her, the intestate could not and did not at any time see said train or the approach thereof; that her sense of sight and sense of hearing were good, and she used each

NOVEMBER TERM, 1904.    193

Smith *v.* Michigan Cent. R. Co.—35 Ind. App. 188.

to discover the approach of any engine or train to the crossing; that the passenger-train which struck deceased was by appellee negligently and carelessly run through the city and over the crossing at a high and dangerous rate of speed, to wit, thirty miles per hour, contrary to said ordinance, and negligently and carelessly ran and propelled its said east and west-bound trains so nearly simultaneously over the crossing as to be practically at the same time, and thereby drowned, deadened and made inaudible the noise and signals of the train which struck the intestate; that this condition of running trains was unusual and unknown to the intestate; that, instead of shutting said safety-gates and keeping them shut while said west-bound train approached and passed the crossing, the appellee negligently and carelessly opened and raised the same, contrary to said ordinance and its own custom; that the appellee, through Armstrong, negligently and carelessly invited the intestate to cross the tracks, when she was so killed, and gave her assurance of safety as it would have been its and his duty to do if it had in fact been safe; that by reason of the appellee's negligence and carelessness aforesaid the appellant's intestate was killed as aforesaid, and her death was entirely due to appellee's negligence aforesaid, and entirely without fault or negligence on her part or on the part of the appellant; that said heirs and next of kin were damaged in the sum of, etc. Wherefore, etc.

The interrogatories answered by the jury were numerous. Many of the answers thereto need not be noticed. We will state the substance of all those which may be supposed to have induced the action of the court: The gate on the south side of the crossing was forty-six feet from the south rail of the south railroad track. This track was four feet and eight and one-half inches in width. There was a space of eight feet and four inches between the south track and the middle or west-bound track. The distance

from the south gate to the south rail of the middle track was fifty-eight feet and ten inches. The appellee's right of way on which these tracks were laid was straight and level for a distance of more than one-half a mile immediately east of Oakley avenue crossing. A street known as Plummer avenue was immediately south of and adjoining and parallel with the appellee's right of way for a mile east and more than a block west of Oakley avenue. From the time the intestate entered upon Plummer avenue, passing north on the east side of Oakley avenue, until she reached the middle or west-bound track, there was an obstruction, being the east-bound train, which would prevent her from observing the approach of a locomotive upon the middle track from the east toward Oakley avenue, for a distance of 500 feet. From the time she passed the south gates until she reached the south rail of the south track there was an obstruction, being the east-bound train, which would prevent her from seeing the approach of a locomotive and train from the east on the middle track at any point within five hundred feet. "Interrogatory twenty-one. Did a passenger-train pass said crossing going from the west to the east on the south or east-bound track while said decedent was between the gate on the south of said crossing and the south or east-bound track? A. Yes." "Interrogatory twenty-two. If you answer the foregoing interrogatory in the affirmative, please state at what distance south of the south rail of said east-bound or south track the decedent stood while said train was passing over said track to the east? A. Six or seven feet." "Interrogatory twenty-three. How far was it from the point where said decedent stood when said east-bound train passed to the south rail of the west-bound or middle track? A. Nineteen or twenty feet."

Being asked, at what rate "per mile" did the intestate travel in passing from the point where she stood while the east-bound train passed until she reached the south rail

NOVEMBER TERM, 1904.    195

Smith *v.* Michigan Cent. R. Co.—35 Ind. App. 188.

of the west-bound track, the jury answered: "About three miles." At the time when the rear end of the east-bound train passed the spot where the intestate then stood, the west-bound passenger engine was about one hundred feet east of the crossing. After the east-bound train passed there were obstructions, consisting of that train, dust and smoke, which prevented the intestate from seeing the approach of the engine and train upon the middle track. "Interrogatory twenty-seven. Did the said decedent look to the east or listen for the approach of the said west-bound train, by which she was struck, at any time after she left the spot where she stood waiting for the east-bound train to pass? A. No." "Interrogatory twenty-nine. Could the decedent have seen the train approaching from the east at any time after she passed the middle of the south or east-bound main track? A. Yes." "Interrogatory thirty-one. Did the said decedent, at any time while approaching said point where she was so struck, look or listen for the approach of the said west-bound train by which she was struck? A. No." "Interrogatory thirty-two. Could not the decedent have seen the approaching train by which she was struck at any time while she was within a distance of ten feet of the south rail of the said middle or west-bound track, had she looked? A. No." "Interrogatory thirty-five and one-half. If you answer interrogatory thirty-two in the negative, please state what there was to prevent her seeing said train at said time. A. Because the rear car of the east-bound train obstructed the view."

The intestate was in full possession of the senses of sight and hearing and of all her faculties and senses, and she was an able-bodied, ordinarily strong woman, of the age of about fifty years. There was enough daylight for a person in full possession of the sense of sight to see distinctly any person or object at a distance of from 500 to 1,000 feet. There was enough daylight for her to see distinctly, at a distance of 500 feet, the engine by which she

was struck. The railway, at the crossing, was equipped with electric bells so situated that when an approaching train was within a distance of 500 feet the bells constantly rang so as to be heard anywhere upon the crossing; and these bells were so ringing continuously from the time intestate passed the south gates until she was struck. The gates on the south side of the crossing were lowered across the sidewalk before the intestate reached them; but they were not kept lowered continuously from that time until she was struck by the train. She did not make any effort, before stepping upon the track on which she was struck, to discover or ascertain whether a train was approaching from the east. At the time of her death the intestate lived with her two brothers and her nephew, the son of one of those brothers. These two brothers were not her only heirs at law. She and her said brothers and nephew lived together as a family, and each of them contributed all of his or her time and efforts to the support and maintenance of said family. "Interrogatory forty-six. Did not said two brothers and nephew contribute to said decedent their time and efforts and earnings as an equivalent for her time and efforts and earnings in sustaining said family relations? A. Yes." The intestate did not earn or accumulate any property or means by her efforts prior to or at the time of her injury, and she did not have any estate whatever. She was not paid anything by her said brothers or nephew for her services or efforts in so maintaining the family. "Interrogatory fifty. Did not the said two brothers and nephew of said decedent contribute their time and efforts and earnings in payment of all services rendered by said decedent to them in their said family relations? A. Yes." The time and services and efforts of the intestate were not more valuable than the time and efforts and services and contributions of her said brothers or either of them. "Interrogatory fifty-two. At what rate of speed was the said

west-bound train traveling, at the time it struck the decedent, Cynthia Tuley? A. About fifteen miles."

1. The general verdict should have been allowed to control the judgment, unless there be between the general verdict and the facts specially found a material conflict not reconcilable by taking into consideration any other facts provable under the issue. Applying this general rule to the case in hand, the general verdict should not have been overridden unless we can say that the special answers establish, notwithstanding any supposable additional findings that might have been made upon any admissible evidence, that the appellant's intestate proximately contributed to her death by her own negligence, or that there was no person entitled to damages for the wrongful causing of her death.

2. If there is any uncertainty, confusion or ambiguity in an interrogatory, such that the jury may reasonably be regarded as having taken or understood it in a sense which rendered their special answers thereon not inconsistent with their general verdict, such standpoint of the jury should be taken by the court in determining the proper effect of the special answers.

3. If it could certainly be said that a clear and direct finding that the intestate went under the closed gates while the east-bound train was passing, and stood near the train waiting for it to pass, would be in irreconcilable conflict with the general verdict, yet we do not discover anything in the special answers which necessarily must be so understood, or anything necessarily contrary to a conclusion that she proceeded to attempt to cross the railway tracks after the gates had been opened, and because they had been opened. The answers are consistent with a conclusion that the gates were raised while the east-bound train was still upon the crossing, while the rear cars were passing. A pedestrian then passing the gates would be unable to go upon the tracks until after the way was cleared, and the opening of the gates

at such time might be regarded as intended to indicate that the way was open and safe, except as made otherwise by the east-bound train, which in itself was not at any time dangerous to the intestate. Assuming that the answers were intended to indicate the rate of speed per hour at which the intestate was walking and the rate per hour at which the west-bound train was running—which they do not distinctly express—the distance which the intestate walked from the place where she paused for the passing of the east-bound train to the place where she was struck was only about nineteen or twenty feet, and during the time she was walking that distance the west-bound train came about one hundred feet, with five times the rapidity of her walking.

4.   It was found that while approaching the place where she was struck she did not look or listen for the train by which she was struck; and that she did not look to the east or listen for the approach of the particular train after she left the spot nineteen or twenty feet from the south side of the west-bound track—that is, for about four and one-half seconds. It was also found that she could not have seen this train at any time while she was within ten feet of the south rail of the middle track, if she had looked, because the rear car of the east-bound train obstructed the view. Again, to the question whether she could have seen the approaching train at any time after she passed the middle of the south track—that is, after she was within ten or eleven feet of the middle track—the jury answered in the affirmative. If it were found that she saw the train at the instant when it struck her, or after it was too late to escape, it would not be untrue that she could see the train at some time after passing the middle of the south track. It was also expressly found that the east-bound train was an obstruction which would prevent her from observing the approach of the west-bound locomotive for a distance of 500 feet after she entered upon Plummer avenue until she reached the middle track, and it

## NOVEMBER TERM, 1904. 199

Smith *v.* Michigan Cent. R. Co.—35 Ind. App. 188.

does not appear that she could have observed the west-bound train before she reached Plummer avenue.

5. The east-bound train, it was found, would prevent her from seeing the approach of the other train within five hundred feet from the time when she passed the gates until she reached the south track; and, after the east-bound train passed, it and dust and smoke constituted an obstruction which prevented her from seeing the approach of the other train. It was not necessarily implied that she could see the west-bound train because it was found that the track was straight. The facts that there was sufficient daylight to see the train, and that she was in possession of unimpaired faculties, tend to show merely that she was not prevented by darkness or impaired faculties from knowing her danger, but do not conclusively indicate that there was not any other sufficient reason why she did not know it, or that she could have known it by looking to the east. There is no finding inconsistent with supposable evidence that the running of the two trains so that both would pass this crossing at about the same time was unusual, or with proof that she was acquainted with the usual times of the trains, and that the west-bound train was not running on its schedule time.

6. It does not appear that the ringing of the bells, which continued from the time the intestate passed the gates until she was struck, was caused by the west-bound train alone, or not also by the east-bound train, or that it would not have been caused during such interval by the passing of the east-bound train alone.

7. Contradictory special answers nullify each other; and findings which are obscure, uncertain or ambiguous must be taken most strongly against the party seeking judgment in his favor upon them contrary to the general verdict.

Manifestly, the death of the intestate was caused by appellee's negligence in opening the safety-gates in violation of the ordinance, and in the running of the west-bound train

at an excessive speed forbidden by the ordinance. At the same time that the appellee, by its negligent act in opening the gates, gave an affirmative indication of safety, there were caused, by the appellee alone, the noises made by the east-bound train and by the ringing bells, and also the obstructions to the view, consisting of the intervening eastbound train and smoke and dust.

We do not observe any facts definitely found by the jury in their answers to interrogatories which might not properly be taken into consideration with all other facts provable, under the issue, in determining whether contributory negligence on the part of the decedent was established by a preponderance of the evidence; or any facts so found which would require the court to ignore the general verdict.

8.   Here there was no reliance merely on the absence of a gate tender, and consequent failure to operate the gates, but the intestate found the gates closed and the train passing eastward, and after she had paused and waited until the train was clearing the crossing, the gates were opened. There was affirmative indication given by the appellee that its gatekeeper was at his post, and engaged in the operation of the gates. If it may be said that the closing of the gates constituted a warning not to enter upon the crossing and a positive signal that it would be unsafe to do so, the opening of the gates as the east-bound train was leaving the crossing was a signal that the crossing was clear and safe, and an implied invitation to the public, including the intestate, to cross over. Besides, we can not say that evidence of a personal invitation from the gatekeeper to the intestate in some manner other than by the mere opening of the gates, would have been inadmissible under the averments of the complaint, though in this regard the complaint is obscure. The question here involved has been discussed and decided so frequently that we can not think it necessary to lengthen our opinion further than by reference to some of the cases in our own State. See *Pennsylvania Co.* v. *Stege-*

*meier* (1889), 118 Ind. 305, 10 Am. St. 136; *Chicago, etc., R. Co.* v. *Hedges* (1886), 105 Ind. 398; *Cadwallader* v. *Louisville, etc., R. Co.* (1891), 128 Ind. 518, 521; *Stoy* v. *Louisville, etc., R. Co.* (1903), 160 Ind. 144; *Indianapolis Union R. Co.* v. *Neubacher* (1896), 16 Ind. App. 21; *Peirce* v. *Jones* (1899), 22 Ind. App. 163.

9. It was specially found that the intestate left surviving her two brothers and a nephew, and that these two brothers were not her only heirs at law, but the jury did not specially designate the other heirs, or state the relationship between them and the intestate, or indicate affirmatively that they had no reasonable grounds to anticipate any material benefit from the continuance of her life. We can not agree with counsel that the findings show conclusively that the brothers and nephew with whom she lived had no reasonable expectation of material benefit of a pecuniary value from the continuance of her life. They so lived together, and rendered each other such services, that, while she was dependent upon them, they were also dependent upon her. There does not appear to have been any contract relation between them. They lived together as members of one family. Her services were not rendered for any stipulated reward as wages, and she actually did not receive money to be treated as her exclusive property, and to be laid up as savings for herself. The services rendered by her, measurable by a money value, the continuance of which, from a sense of obligation by reason of the relationship of the parties, might be expected, could not be supplied after her death without the payment of wages. It was not necessary to a recovery that she should have been under a legal obligation to render such services. The case, we think, is readily distinguishable from *Diebold* v. *Sharp* (1898), 19 Ind. App. 474, and *Wabash R. Co.* v. *Cregan* (1899), 23 Ind. App. 1, cited by the appellant.

Judgment reversed, and cause remanded, with instruction to render judgment in accordance with the general verdict.